JUDGE FURMAN

# 21 CV 05743

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>W. Benson Chiles and Chris Manthey,<br><br>                                Plaintiffs,<br><br>v.<br><br>Cooke Inc., Cooke Aquaculture Inc., Cooke<br>Omega Investments Inc., Cooke Seafood USA,<br>Inc., Omega Protein Corporation, Omega<br>Protein, Inc., Alpha VesselCo Holdings, Inc.<br>a/k/a Ocean Fleet Services, Inc., Alpha<br>VesselCo, LLC d/b/a/ Ocean Harvesters, BMO<br>Capital Markets Corp., Glenn Cooke, Seth<br>Gregory Dunlop, Gregory Lawson Dunlop,<br>Bret D. Scholtes, and Montgomery Deihl,<br><br>                                Defendants. | Case No.<br><br>***QUI TAM* COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Filed in Camera and Under Seal<br>pursuant to 31 U.S.C. § 3730(b)(2). |

---

*Qui tam* plaintiffs and relators, W. Benson Chiles and Chris Manthey, on behalf of the

United States of America (the "United States" or the "Government"), allege as follows:

### INTRODUCTION

1.      This is a False Claims Act suit regarding "figurehead fraud."  This case concerns

the control of a large fleet of fishing vessels by a foreign seafood conglomerate called Cooke Inc.

and its subsidiaries, affiliates, officers, and employees ("Cooke").  Under the American Fisheries

Act of 1998 (the "AFA" or the "Act"), foreign citizens like Cooke may not have de facto

"control" over any vessel that engages in commercial fishing in United States waters (the "AFA

Citizenship Requirement").  Defendants have been violating that "control" prohibition since

2017.  Defendants created a supposedly independent domestic shell company to nominally own

the vessels, but they installed a long-time Cooke employee—who also happens to be the nephew

of the Cooke CEO—as a figurehead to "own" that entity on the understanding that actual control

would be exercised by Cooke. Then, to fish in United States waters, Defendants falsely certified to the Maritime Administration ("MARAD")—an agency of the United States Department of Transportation ("DOT")—and the United States Coast Guard ("Coast Guard") that the vessels' owner complied with the AFA Citizenship Requirement. Defendants also concealed from MARAD multiple close connections between Cooke and the vessels' nominal owner, including that he is a long-time Cooke employee and the Cooke CEO's nephew. As a result of their fraudulent scheme, Defendants have illegally harvested from United States waters many millions of dollars' worth of fish to which they are not entitled.

2.      The AFA imposes extremely high statutory penalties on entities that engage in commercial fishing in violation of the AFA Citizenship Requirement. Vessel owners must periodically submit to MARAD an affidavit stating that there is no "understanding" pursuant to which control of the vessel may be exercised by a non-citizen. The failure to disclose material information in connection with that affidavit or the accompanying supporting submissions currently carries a statutory penalty of over $154,000 *per* vessel, *per day* of fishing in United States waters. Defendants' fleet of fishing vessels operates as often as the weather permits during the fishing season, which can last up to seven months each year. Therefore, the total statutory penalty across the many years that Defendants have been falsely certifying compliance with the AFA Citizenship Requirement likely exceeds several hundred million dollars and could exceed $2 billion.

3.      Cooke, through its subsidiaries Omega Protein Corporation ("Omega Corporation") and Omega Protein, Inc. ("Omega Protein," and collectively with Omega Corporation, "Omega"), operates in the menhaden harvesting and processing industry. Menhaden is a commercially valuable fish. By tonnage, the "menhaden fishery" is the second

largest fishery in U.S. waters. Omega catches menhaden and "reduces" it into fish-oil supplements, fish meal, animal feed, and other commercial products. The recreational fishing industry uses menhaden as bait. Menhaden also serves as bait and forage for other commercially valuable species in U.S. waters.

4.     The United States menhaden reduction fishing industry is a duopoly, and Omega is the dominant player. As of September 30, 2017, Omega was a domestic, publicly-traded company that owned a fleet of 37 fishing vessels measuring over 100 feet in registered length (the "Omega Vessels"), 48 smaller vessels used to assist in Omega's fishing operations, 27 spotter aircraft to help "spot" large schools of fish from the air, 3 fish-processing plants, and a shipyard. Omega deployed and continues to deploy these resources to harvest menhaden from U.S. waters in the Atlantic Ocean and the Gulf of Mexico.

5.     On December 17, 2017, Defendant Cooke—a privately held Canadian corporation controlled and beneficially owned by a single family—acquired Omega and its subsidiaries and assets, including the Omega Vessels (the "Acquisition"). Pursuant to the Acquisition, the Omega entities became Cooke subsidiaries and thus became—like all Cooke subsidiaries—foreign entities under the Act, prohibited by law from owning or controlling U.S. commercial fishing vessels. Nonetheless, Cooke, Omega, and their subsidiaries have exercised continuous control over the Omega Vessels, including their operations and commercial fishing activities. They also control the domestic shell that Cooke and Omega created to serve as the nominal owner of the Omega Vessels.

6.     The Acquisition was the culmination of a negotiation process that began in approximately April 2017. Defendants soon realized that the Acquisition would render the Omega Vessels ineligible to fish in U.S. waters because they would be owned and controlled by

Cooke and Omega, both non-citizens under the Act. Defendants responded by crafting and executing a figurehead scheme to violate the AFA Citizenship Requirement, conceal the violation, and defraud the United States.

7.     In the first step of the figurehead scheme, Defendants deliberately and secretly violated the AFA Citizenship Requirement. Cooke—instead of simply acquiring Omega and owning its vessels—restructured the entire Acquisition to create an illusion of compliance with the AFA Citizenship Requirement. Omega transferred the Omega Vessels to a new subsidiary and then sold that subsidiary to a new Delaware shell entity which is 20% owned by Omega and 80% owned by a U.S. citizen named Seth Dunlop. But Seth Dunlop was just a figurehead; Cooke and Omega retained control. Seth Dunlop is a long-time Cooke employee, and he is the nephew of the Cooke CEO. Seth Dunlop and his father, Gregory Dunlop, are the CEO and Secretary, respectively, of the Delaware shell, and they are its sole Directors. Gregory Dunlop is also a long-time Cooke employee, and he is also related to the Cooke CEO. From the beginning, each of these closely connected persons, as well as Omega, shared an understanding that Cooke and Omega would control the Omega Vessels and the Delaware shell. And from the Acquisition up through this day, Cooke and Omega have in fact controlled them.

8.     In the second step of the scheme, Defendants submitted, caused the submission, and/or conspired to submit, false and fraudulent fishery endorsement applications to MARAD and the Coast Guard, on an annual basis, for every Omega Vessel. Those applications contain—as required by the AFA and by MARAD regulations—sworn citizenship affidavits and supporting submissions that *expressly and falsely represent that there is no "understanding" by which a non-citizen controls the nominal owner of the Omega Vessels*. Those applications also omit material information that undermines that false representation. In particular, the

applications omit material information concerning all the connections between Seth Dunlop, Greg Dunlop, Glenn Cooke, and Cooke. Defendants' "applications" also include multiple informal communications (conducted by email and, on information and belief, by phone, pursuant to MARAD regulations) between counsel for Defendants and the MARAD Citizenship Approval Officer. On information and belief, Defendants made, caused to be made and/or conspired to make substantively similar material misrepresentations and omissions in the course of those informal communications. On information and belief, Defendants also took certain additional steps intended to prevent MARAD, DOT, and the Coast Guard from independently discovering material information omitted from their fraudulent applications.

9.     Defendants knew the above representations were false and misleading. Each Defendant shared the same understanding that Cooke and Omega would continue to control the Omega Vessels and the Delaware shell, and would operate them for their own financial benefit. Each Defendant knew that Seth Dunlop was a Cooke employee and the nephew of the CEO. Each Defendant knew that Gregory Dunlop was a Cooke employee and related to the CEO. Each Defendant knew that Seth and Gregory Dunlop were not arms-length counterparties to Cooke. Each Defendant knew that the plan was for Seth Dunlop and Gregory Dunlop to be figureheads that would cede de facto control over the shell and the Omega Vessels to Cooke and Omega.

10.     In fact, each Defendant knew that controlling the Delaware shell and retaining control over the Omega Vessels was a critical premise of the Acquisition itself. When raising money to finance the Acquisition, Defendants confidentially bragged to potential investors that the Delaware shell would be owned by a Cooke employee who was the Cooke CEO's nephew. In other words, Defendants confidentially reassured potential investors that "selling" the Omega

Vessels to a "third party" was not an arms-length transaction, would not constrain Cooke or Omega's ability to maximize profits, and would not imperil Defendants' ability to pay back investors. But although Defendants communicated that understanding confidentially to prospective investors, Defendants concealed it from the U.S. Government.

11.     If Defendants had not falsely represented to the Government, under penalty of perjury, that the Delaware shell and Omega Vessels would be in fact controlled by the figurehead, or if Defendants had disclosed the material facts regarding the understandings and arrangements through which Cooke and Omega exercise actual control over the figurehead, MARAD would have determined that the Omega Vessels could not operate in the United States commercial fisheries, and Defendants would not have harvested millions of dollars' worth of fish.

## PARTIES

12.     Relator Chris Manthey is a professional investigator and researcher. In 1993, Mr. Manthey co-founded BackTrack Reports, a private investigations firm in New York focused on pre-deal background research on corporate executives. Mr. Manthey subsequently sold BackTrack Reports and continues to work as an investigator and researcher for a variety of organizations. Mr. Manthey currently resides in New York.

13.     Relator W. Benson Chiles works in the fisheries management industry and monitors issues relating to commercial and recreational fishing in U.S. waters. In his work, Mr. Chiles occasionally receives non-public information regarding corporations operating in the U.S. commercial fishing industry, including Defendants Cooke and Omega. Mr. Chiles currently resides in Atlantic Highlands, New Jersey.

14.     Relators are suing on behalf of the United States, including MARAD, an agency within the DOT, with headquarters in Washington, DC, and the Coast Guard, an agency within the United States Department of Homeland Security. MARAD's "mission" is "[t]o foster, promote and develop the maritime industry of the United States to meet the nation's economic and security needs." The Coast Guard serves many functions and has broad law enforcement authorization.

15.     Defendant Cooke Inc. is incorporated under the laws of the Province of New Brunswick, Canada. Its principal executive office is located at 40 Wellington Row, Saint John, NB, Canada, E2L 3H3. Upon information and belief, Cooke's revenues in 2018 totaled approximately $2.4 billion. All shares of Cooke are beneficially owned by members of the family that founded the company (the "Cooke Family"). Cooke owns Defendants Cooke Omega Investments Inc. ("Cooke Omega Investments"), Cooke Aquaculture, Inc. ("Cooke Aquaculture") and Omega. Through its Omega subsidiaries, Cooke owns a 20% interest in Defendant Alpha VesselCo Holdings, Inc., a/k/a "Ocean Fleet Services" ("Holdings/Ocean Fleet Services").

16.     Defendant Cooke Omega Investments is a Canadian corporation, a wholly owned subsidiary of Cooke, and the parent of Omega. Defendants Cooke Omega Investments and Holdings/Ocean Fleet Services co-issued $330,000,000 aggregate principal amount in 8.5% Senior Secured Notes (the "Notes") pursuant to the terms of a confidential Offering Memorandum dated December 13, 2017 (the "Offering Memorandum"). Defendants used the $330 million proceeds of the Notes offering to finance the Acquisition. In particular, Defendants allocated nearly $30 million of the Notes proceeds to Defendant Holdings/Ocean Fleet Services, which then "used" those funds to "purchase" the Omega Vessels from Omega. Defendants

Cooke Omega Investments and Holdings/Ocean Fleet Services, as well as Defendant BMO Capital Markets Corp. ("BMO Capital" or "Initial Purchaser"), marketed the Notes by, among other means, distributing to certain accredited investors a confidential presentation titled "Cooke Omega Investments Inc. Roadshow Presentation" dated December 2017 (the "Roadshow Presentation").

17.     Defendant Cooke Aquaculture, a vertically integrated Canadian corporation, is the largest aquaculture company and producer of farm-raised Atlantic salmon in North America, delivering over 110,000 tons of salmon per year.  Cooke Aquaculture wholly owns multiple subsidiaries in the United States, including Defendant Cooke Seafood USA, Inc. ("Cooke Seafood USA"), a Delaware corporation with its principal place of business at 2000 Northgate Commerce Parkway, Suffolk, Virginia 23435 (the "Cooke Seafood USA Address"); nonparty Wanchese Fish Company ("Wanchese"), a North Carolina corporation with its principal place of business at the Cooke Seafood USA address, and nonparty Icicle Seafoods, Inc. ("Icicle Seafoods"), an Alaska corporation with its principal place of business at 4019 21st Ave. W., Seattle, WA 98199 (the "Icicle Seafoods Address").

18.     Defendant Omega Corporation is the parent of Defendant Omega Protein.  Prior to the Acquisition, Omega Corporation was a publicly traded company listed on the New York Stock Exchange.  As a result of the Acquisition, Omega Corporation is a wholly owned subsidiary of Cooke and Cooke Omega Investments.  Omega Corporation owns 20% of the common stock of Defendant Holdings/Ocean Fleet Services.

19.     Defendant Omega Protein is a wholly owned subsidiary of Defendants Omega Corporation, Cooke Omega Investments, and Cooke.

20.     Defendant Holdings/Ocean Fleet Services is a Delaware corporation.  Cooke's

attorneys incorporated Defendant Holdings/Ocean Fleet Services as "Alpha VesselCo Holdings,

Inc." on October 3, 2017.  On October 5, 2017, Holdings/Ocean Fleet Services entered into a

contract with Omega to purchase a to-be-created shell entity (subsequently created as Defendant

Alpha VesselCo, LLC) on the closing date of the Acquisition.  Before it held legal title to *any*

assets, Holdings/Ocean Fleet Services co-issued the Notes with Defendant Cooke Omega

Investments.  Then, on the closing date of the Acquisition in December 2017, Holdings/Ocean

Fleet Services acquired 100% of the membership interests in Defendant Alpha VesselCo from

Defendant Omega, for a total purchase price of $30 million.  Holdings/Ocean Fleet Services

"paid" the purchase price as follows:  (i) a $28.75 million "carve-out" from the proceeds of the

Notes, (ii) a "$1 million equity investment" putatively from Defendant Seth Dunlop, and (iii) a

20% ownership stake in itself (which the parties valued at $250,000).  On information and belief,

on approximately February 8, 2019, Defendants changed the legal name of Defendant

Holdings/Ocean Fleet Services to "Ocean Fleet Services, Inc."

21.     Defendant Alpha VesselCo, LLC ("Alpha VesselCo"), d/b/a "Ocean Harvesters,"

is a member-managed Delaware limited liability corporation and the nominal owner of the

Omega Vessels.  Omega created Alpha VesselCo as its own subsidiary on October 24, 2017, for

the sole purpose of holding legal title to the Omega Vessels and certain other fishing assets,

pursuant to the terms of a merger agreement with Cooke.  On the Acquisition closing date in

December 2017, Omega then sold 100% of the membership interests in Alpha VesselCo to

Defendant Holdings/Ocean Fleet Services.  On information and belief, Alpha VesselCo had no

employees on the Acquisition closing date.  Its principal place of business is located at the Cooke

Seafood USA Address.  At all relevant times, the Omega Vessels have conducted commercial

fishing operations throughout Atlantic and Gulf waters at the direction and for the benefit of Defendants Cooke, Omega, and their subsidiaries, affiliates, and representatives.

22.    Defendant Glenn Cooke is the Chief Executive Officer of the "Cooke family of companies," including Defendants Cooke and Cooke Aquaculture, and he controls multiple Cooke subsidiaries, including Defendant Cooke Seafood USA. He is a member of the Cooke Family. Glenn Cooke is also the "President" of Cooke subsidiaries Wanchese, Daniels Development, Inc. ("Daniels"), Suffolk Cold Storage, Inc. ("Suffolk"), and Shoreland Transport USA, Inc. ("Shoreland"), all of which have the same address as Defendant Alpha VesselCo. Glenn Cooke is also a "Governor"—*i.e.* a director under Washington state law—of non-party and Cooke subsidiary Icicle Seafoods. Glenn Cooke is the uncle of Defendant Seth Dunlop and is the brother-in-law of Defendant Gregory Dunlop. On information and belief, Mr. Cooke is a Canadian citizen and a resident of Canada. Glenn Cooke co-founded Cooke with his brother Michael and his father Gifford. Describing the history of Cooke, Glenn Cooke has stated: "Family means the most to me of all."

23.    Defendant Seth Gregory Lawson Dunlop ("Seth Dunlop") is a Cooke employee, the nephew of Defendant Glenn Cooke, the son of Defendant Gregory Dunlop, and a member of the Cooke Family. Mr. Dunlop started working at Cooke in 2006, when he turned 18. Around the time of the Acquisition, Seth Dunlop's title at Defendant Cooke Aquaculture changed to "Global Business Development." Since the Acquisition, Seth Dunlop has also been the nominal Chief Executive Officer, Chairman, and Director of Defendant Holdings/Ocean Fleet Services and the nominal owner of 80% of its common stock. In addition, Seth Dunlop serves as Vice President of at least four Cooke subsidiaries co-located with Defendant Alpha VesselCo at the Cooke Seafood USA Address for which his uncle, Defendant Glenn Cooke, serves as President:

Wanchese, Daniels, Suffolk and Shoreland. *In addition*, Seth Dunlop serves as an officer and director of multiple entities that are co-located with Cooke subsidiary Icicle Seafoods at the Icicle Seafoods Address, as set forth in Paragraph 28. On information and belief, several of those entities serve as the nominal owner of one or more fishing vessels deployed in the Icicle Seafoods fleet. On information and belief, Seth Dunlop is a resident of Canada.

24.    Defendant Gregory Lawson Dunlop ("Gregory Dunlop") is a Cooke employee, the brother-in-law of Defendant Glenn Cooke, the father of Defendant Seth Dunlop, and a member of the Cooke Family by marriage. Gregory Dunlop's title is "Vice President Global Risk Management" at Cooke. Since 2017, Gregory Dunlop has also been the Secretary of Defendant Holdings/Ocean Fleet Services. In addition, Gregory Dunlop serves with his son Seth as an officer and director of multiple entities that are co-located with Cooke subsidiary Icicle Seafoods at the Icicle Seafoods Address, as set forth below in paragraph 28. On information and belief, several of those entities serve as the nominal owner of one or more fishing vessels deployed in the Icicle Seafoods fleet. On information and belief, Gregory Dunlop is a resident of Canada.

25.    Defendant Bret D. Scholtes is the former President and Chief Executive Officer of Omega. He served in those roles for many years, including from the time of the Acquisition through the end of the 2020 fishing season. Mr. Scholtes is currently the President and Chief Executive Officer of Guardion Health Sciences, Inc., which is based in San Diego, California.

26.    Defendant Montgomery "Monty" Deihl has been employed by Omega Protein from 2009 to the present. From March 2015 until at least December 2017, Mr. Deihl was the Vice President of Operations at Omega Protein. Since December 2017, Defendants have

variously stated that Mr. Deihl is still the Vice President of Operations at Omega Protein and also that he is the Vice President of Defendant Holdings/Ocean Fleet Services.

27.     Non-parties Daniels, Suffolk, and Shoreland are Cooke subsidiaries that share the Cooke Seafood USA Address with Defendants Alpha VesselCo and Cooke Seafood USA and non-party Wanchese. Defendant Glenn Cooke is the President of all three Cooke subsidiaries (and also of Wanchese), and Seth Dunlop is the Vice President of all three Cooke subsidiaries (and also of Wanchese).

28.     Non-parties Icicle Vessel Holding, Inc. (a Washington corporation), WA Vessel Company LLC (a Washington LLC), Progress Fishing LLC (a Washington LLC), ISVesselCo, Inc. ("ISVesselCo") (a Delaware corporation), Evening Star, Inc. (an Alaska corporation), Coastal Star, Inc. (an Alaska corporation), and AK Vessel Company LLC (an Alaska LLC) are located at the Icicle Seafoods Address. Defendant Gregory Dunlop is the Director, President and Treasurer (and Defendant Seth Dunlop is the Secretary and Vice President) of Evening Star, Inc. Defendants Seth and Gregory Dunlop are also the "Governors" (*i.e.*, directors) of the other six entities located at the Icicle Seafoods Address. As with Defendants Alpha VesselCo and Omega, ISVesselCo is party to a long-term fish supply agreement with Icicle Seafoods. In the Offering Memorandum, Defendants state that ISVesselCo—which was incorporated in 2016, the year in which Cooke acquired Icicle Seafoods—is a "vessel-owning company on the West Coast of the United States." Further, on information and belief, at least three of the entities co-located at the Icicle Seafoods Address hold title to fishing vessels that operate in the Icicle Seafoods fleet: AK Vessel Company (which owns the Viking Queen), Coastal Star Inc. (which owns the Gordon Jensen), and Progress Fishing LLC (which owns Progress).

29.     Defendant BMO Capital is a Delaware corporation with its principal place of business in New York.  BMO Capital provided financing for the Acquisition by (i) purchasing the entire principal amount of the Notes pursuant to a purchase agreement with Defendants Cooke Omega Investments and Holdings/Ocean Fleet Services, and (ii) marketing and re-selling the Notes to certain accredited investors in reliance on the exemption from the registration requirements of the Securities Act provided by Rule 144A, pursuant to the terms of the Offering Memorandum.  Prior to the Acquisition, BMO Capital served as a financial advisor to Omega.

30.     Non-Party DNB Capital LLC ("DNB"), a New York LLC with its principal place of business in New York, provided certain financing for the Acquisition.  Concurrent with the signing of the Merger Agreement, DNB entered into a credit facility with Defendant Cooke, pursuant to which DNB agreed to loan Cooke a principal amount of $200 million, to be repaid by incremental borrowings by Cooke Aquaculture.  Defendant Cooke used the proceeds of the DNB loan to fund a portion of the consideration for the Acquisition.

## JURISDICTION AND VENUE

31.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

32.     This Court has personal jurisdiction over each of the Defendants by virtue of 31 U.S.C. § 3732(a), a federal statute authorizing worldwide service of process.

33.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants is found, resides, or transacts business in this district, or because one or more acts proscribed by 31 U.S.C. § 3729 occurred in this district.  Venue is further proper in this district pursuant to 28 U.S.C. § 1391(c)(3).

## BACKGROUND

34.     The United States invests substantial resources in managing, preserving, protecting, and maintaining fish in U.S. waters.  Scores of individual fish stocks are intensively monitored and preserved by the Department of Commerce; multiple Regional Councils; interstate compacts acting under express grants of statutory authority from Congress; state, academic and non-profit organizations funded in part by the U.S. Government; and also by the Department of Transportation, Coast Guard, and Maritime Administration.  Among other reasons that the Government monitors and invests heavily in fish, the recreational and commercial fishing sectors are major sources of revenues and jobs.  For example, the striped bass fishery alone—one of the many species that relies on menhaden as a food source—contributes approximately $7 billion towards national GDP.

35.     The Government also invests substantial resources in the U.S. maritime industry.  Most recently, President Biden's Executive Order dated January 25, 2021, "Executive Order on Ensuring the Future is Made in All of America by All of America's Workers", strengthened the Government's commitment to "Made in America Laws", and explicitly provided that "Made in America Laws" include the Merchant Marine Act of 1920 (also known as the Jones Act).  The Jones Act imposes a citizenship requirement on vessels that operate in the domestic maritime transport industry.  The AFA explicitly incorporates and strengthens the Jones Act citizenship requirement, because eligibility to take fish from United States waters sits at the intersection of two long-standing and uniquely strong domestic priorities: the commercial fishing industry and control of vessels that operate commercially in U.S. waters.

## I.     THE CITIZENSHIP REQUIREMENT

36.     Under federal law, a vessel may "engage in the fisheries"—which means it may be used to conduct commercial fishing operations including "catching, taking, or harvesting fish"

in U.S. waters and the U.S. exclusive economic zone—if, and only if, the vessel has a valid fishery endorsement.

37.     The conditions for fishery endorsement eligibility are set forth at 46 U.S.C. § 12113 and the provisions incorporated by reference therein.  Most important among them is the stringent AFA Citizenship Requirement, which became effective on October 1, 2001.  Upon receipt of a proper application for a fishery endorsement for a vessel that satisfies the AFA Citizenship Requirement and certain other eligibility requirements, the Government must issue the endorsement.

38.     A primary goal of the AFA was to "require the U.S. control of fishing vessels that fly the U.S. flag" by borrowing and strengthening elements of citizenship requirements applicable to vessels in other (non-fishing) contexts, and by significantly enhancing Government enforcement of the citizenship requirement applicable to fishing vessels.  To that end, the AFA (i) enacted a citizenship requirement which unambiguously prohibits "any means" of foreign "control" of an entity that owns commercial fishing vessels—including arrangements in which U.S. citizens have legal ownership and titular control of the entity but foreign interests enjoy de facto control; (ii) newly authorized and directed MARAD to administer the AFA Citizenship Requirement for vessels 100 feet or longer in registered length; (iii) explicitly directed MARAD to "rigorously scrutinize[]" transfers of ownership or control of fishing vessels for violations of the AFA Citizenship Requirement; (iv) significantly enhanced the procedures for ensuring compliance with the AFA Citizenship Requirement; and (v) strengthened the penalties for non-compliance, including by creating a new, substantial financial penalty for knowing misrepresentations and omissions regarding compliance with the AFA Citizenship Requirement.

**A.     The "Control" Prohibition in the AFA Citizenship Requirement**

39.     The AFA provides that "[a] vessel owned by an entity is eligible for a fishery endorsement only if at least 75 percent of the interest in the entity, at each tier of ownership and in the aggregate, is owned and controlled by citizens of the United States." 46 U.S.C. § 12113(c)(1).  To determine whether an entity is "owned and controlled by citizens of the United States," certain standards codified at 46 U.S.C. § 50501(d) apply,[1] *except* to the extent that, for the sole purpose of the AFA Citizenship Requirement, the term "control" is broadened to "include the right[s] to (i) direct the business of the entity; (ii) limit the actions of or replace the chief executive officer . . . or any person serving in a management capacity of the entity; or (iii) direct the transfer, operation or manning of a vessel with a fishery endorsement." 46 U.S.C. § 12113(c)(2).

40.     Court and agency decisions applying the standards now codified at 46 U.S.C. § 50501(d)—the same standards incorporated into and strengthened by the AFA Citizenship Requirement—hold that those standards prohibit arrangements that enable de facto control by

---

[1] 46 U.S.C. § 50501(d) provides:  "At least 75 percent of the interest in a corporation is owned by citizens of the United States . . . only if --

(1) title to at least 75 percent of the stock in the corporation is vested in citizens of the United States free from any trust or fiduciary obligation in favor of a person not a citizen of the United States;

(2) at least 75 percent of the voting power in the corporation is vested in citizens of the United States;

(3) there is no contract or understanding by which more than 25 percent of the voting power in the corporation may be exercised, directly or indirectly, in behalf of a person not a citizen of the United States; and

(4) there is no other means by which control of more than 25 percent of any interest in the corporation is given to or permitted to be exercised by a person not a citizen of the United States.

foreign interests. *See, e.g., Meacham Corp. v. United States*, 207 F.2d 535, 539, 543-44 (4th Cir. 1953) ("titular control was given [to the Americans] with the *expectation* that they would exercise their power in the interests of their Chinese associates") (emphasis added); *Conoco, Inc. v. Skinner*, 970 F.2d 1206, 1218 (3d Cir. 1992) (holding that the vessel-citizenship laws "invite, and indeed require, courts to look for *any possible way* in which a non-citizen could exercise more than 25 percent of a vessel-owning corporation's voting power") (emphasis added).

41.     Regulations promulgated by MARAD under the Act (the "MARAD Regulations") similarly expressly prohibit de facto foreign control. *See* 46 C.F.R. § 356.  The MARAD Regulations provide that an entity is a "U.S. Citizen" for the purposes of the AFA Citizenship Requirement only if "[c]ontrol of the entity, by any other means whatsoever, [is not] conferred upon or permitted to be exercised by a Non–Citizen." 46 C.F.R. § 356.3(e)(iv). Limited Liability Companies that own vessels—like Defendant Alpha VesselCo—are "U.S. Citizens" only if "Non-Citizens do not have authority within a management group, whether through veto power, combined voting, or otherwise, to exercise control over the LLC." *Id.*

42.     The MARAD Regulations also set forth 19 "indicia" of an "impermissible transfer of control." 46 C.F.R. § 356.11.  Ten of those indicia are designated as "absolute" signs that a non-citizen is exercising impermissible control.  46 C.F.R. § 356.11(a).  The remaining indicia are non-absolute but are instructive.  46 C.F.R. § 356.11(b).

43.     "Absolute" indicia of prohibited control include any circumstance in which a "Non-Citizen, whether by *agreement,* contract, *influence*, or *any other means whatsoever*": (i) "[h]as the right to direct the business of the entity which owns the Fishing Industry Vessel"; (ii) "[h]as the right in the ordinary course of business to limit the actions of or replace the chief executive officer . . . or any person serving in a management capacity of the entity which owns

the Fishing Industry Vessel"; (iii) "[h]as the right to derive, through a minority stakeholder, and in favor of a Non-Citizen, a significantly disproportionate amount of the economic benefit from the ownership and operation of the Fishing Industry Vessel"; (iv) "[h]as the right to control the management of or be a controlling factor in the entity that owns a Fishing Industry Vessel"; (v) "[a]bsorbs all of the costs and normal business risks associated with the ownership and operation of the Fishing Industry Vessel"; and (vi) "[h]as *the ability through any means whatsoever to control the entity that owns a Fishing Industry Vessel*." 46 C.F.R. § 356.11(a) (emphases added).

44.     Additional "indicia" of an "impermissible transfer of control" to foreign interests include:

1) If a Non-Citizen minority stockholder takes the leading role in establishing an entity that will own a Fishing Industry Vessel;

2) If a Non-Citizen has the right to preclude the owner of a Fishing Industry Vessel from engaging in other business activities;

3) If a Non-Citizen and owner use the same law firm, accounting firm, etc.;

4) If a Non-Citizen and owner share the same office space, phones, administrative support, etc.;

5) If a Non-Citizen absorbs considerable costs and normal business risks associated with ownership and operation of the Fishing Industry Vessel;

6) If a Non-Citizen provides the start up capital for the owner or bareboat charterer on less than an arm's-length basis;

7) If a Non-Citizen time charterer has the general right to inspect the books and records of the owner, bareboat charterer, or time charterer of a Fish Processing Vessel or Fish Tender Vessel;

8) If the owner or bareboat charterer uses the same insurance agent, law firm, accounting firm, or broker of any Non-Citizen with whom the owner or a bareboat charterer has entered into a mortgage, long-term or exclusive sales or marketing agreement, unsecured loan agreement, or management agreement; or

9) If a Non-Citizen has the right to control, whether through sale, lease or other method, the fishing quota, fishing rights or processing rights allocated to a vessel or vessel-owning entity.

*See* 46 C.F.R. § 356.11(b).

**B.     Enforcement of the AFA Citizenship Requirement**

45.     For fishing vessels 100 feet or greater in registered length, the AFA assigns responsibility for fishery endorsement eligibility determinations to MARAD.[2]  The text of the AFA requires MARAD to "rigorously scrutinize[]" all "transfers of ownership and control" of such vessels for violations of the AFA Citizenship Requirement.  46 U.S.C. § 12113(e).

46.     MARAD employs a "Citizenship Approval Officer" whose primary if not sole function is to conduct the statutorily mandated rigorous scrutiny of vessel citizenship.  The Citizenship Approval Officer reports to the MARAD Office of Chief Counsel.

47.     Because a commercial entity's ability to take fish from U.S. waters is absolutely conditioned on compliance with the AFA Citizenship Requirement, the AFA also requires owners of fishing vessels 100 feet or greater in registered length to file, under penalty of perjury, "a statement of citizenship setting forth **all relevant facts** regarding vessel ownership and control" with MARAD, each year, in order to demonstrate continuing compliance with the AFA Citizenship Requirement.  *Id.* (emphasis added).

48.     The MARAD Regulations similarly require vessel owners to "obtain an annual ruling" from the MARAD Citizenship Approval Officer that the vessel owner satisfies the AFA Citizenship Requirement.  In addition, prior to a proposed transfer of ownership or control of a fishing vessel, its owner can request a "letter ruling" from the MARAD Citizenship Approval

---

[2] The Coast Guard—which formerly made all fishery endorsement eligibility determinations—now makes determinations for smaller vessels.  The same AFA Citizenship Requirement applies.

Officer which contains a preliminary determination as to whether the proposed ownership structure will satisfy the AFA Citizenship Requirement.

49.    The MARAD Regulations enumerate certain required supporting submissions and provide that MARAD "may review any contract or agreement that may, by any means whatsoever, result in a transfer of control to a Non-Citizen." 46 C.F.R. § 356.11(3).

50.    If MARAD determines that a fishery endorsement applicant satisfies the AFA Citizenship Requirement, it formalizes its conclusion in a determination letter, which it provides to the Coast Guard and to the applicant. The Coast Guard—acting in reliance on the MARAD determination letter—then includes a fishery endorsement in the vessel's documentation.

51.    The AFA enhanced the penalties for noncompliance with the Citizenship Requirement in several ways. First, the AFA directs the Government to "revoke" the fishery endorsement "of any vessel" subject to the AFA Citizenship Requirement "whose owner does not comply." 46 U.S.C. § 12113(h). In addition, a person who violates any provision of the vessel documentation statutes or regulations promulgated thereunder, including the AFA Citizenship Requirement, is liable to the Government for a civil penalty of up to $16,687 for each day of a continuing violation. *See* 46 U.S.C. § 12151(a); 33 C.F.R. § 37.3.

52.    Second, "in order to discourage willful noncompliance with the new requirements," the AFA created a new penalty for knowingly falsifying or concealing material facts related to the AFA Citizenship Requirement in order to take fish from U.S. waters: "[t]he owner of a documented vessel for which a fishery endorsement has been issued is liable to the United States Government for a civil penalty of up to $100,000[3] for each day in which such

---

[3] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 2015 and MARAD regulations promulgated thereunder, the maximum daily penalties applicable to each vessel during

vessel has engaged in fishing within the exclusive economic zone if the owner or the representative or agent of the owner knowingly falsified or concealed a material fact, or knowingly made a false statement or representation with respect to the eligibility of the vessel under [the AFA Citizenship Requirement] in applying for or applying to renew such fishery endorsement." 46 U.S.C. § 12151(c) (internal citation omitted).

53.    The National Vessel Documentation Center ("NVDC"), a unit within the Coast Guard, is one of the federal bodies that investigates vessel citizenship requirement violations and recommends appropriate penalties. For example, in January 2011, NVDC and MARAD jointly investigated Trico Marine Services, Inc. and its subsidiaries and affiliates ("Trico") for violations of the citizenship requirement for coastwise endorsement eligibility. The investigation resulted in a finding that Trico had violated the citizenship requirement. In February 2012, the Coast Guard approved commencement of a civil penalty assessment process against Trico to collect penalties under 46 U.S.C. § 12151(a). MARAD concurred in the Coast Guard's findings of fact.

## II.    THE AFA VIOLATION

### A.    Cooke Seeks to Acquire Omega and the Omega Vessels

54.    Cooke describes itself as a "global seafood leader with fully-integrated facilities, product lines and distribution networks." In recent years, Cooke has "embarked on an aggressive plan for growth, including acquisitions." Since 2015, Cooke has acquired multiple United States companies, including: Wanchese (2015), Icicle Seafoods (2016), Omega (2017), the Fish Company (2018), All Seas Wholesale, Inc. (2019), and Mariner Seafood LLC (2020). Prior to

---

the relevant periods were as follows: $154,197 (effective July 31, 2019), *see* 46 C.F.R. § 359.49; $150,404 (effective November 27, 2018); $147,396 (effective May 4, 2017).

the Acquisition, Cooke was one of Omega's customers, purchasing processed menhaden to feed to the salmon in the salmon farms operated by Cooke subsidiaries.

55.     According to the proxy statement that Omega filed with the Securities and Exchange Commission, negotiations for the Acquisition began in early April 2017, when Defendant Glenn Cooke called Defendant Bret Scholtes and expressed Cooke's interest in acquiring Omega and all of its subsidiaries, business lines, and assets.  Later that week, Defendants Glenn Cooke, Bret Scholtes and Monty Deihl met for dinner in New York.  They toured Omega facilities the next day.  On April 28, 2017, Defendant Glenn Cooke communicated by letter and by phone to Defendant Scholtes that, based on a preliminary analysis, Cooke was interested in acquiring Omega for $24 per share, or $540 million.

56.     On May 11, 2017, Omega granted Cooke's request for consent to retain Kelley, Drye & Warren LLP ("KDW"), a law firm historically used by Omega, as counsel to Cooke in the Acquisition.

57.     On June 19, 2017, Cooke reaffirmed to Omega its $24 per share purchase price proposal.

58.     In late June 2017, KDW presented Omega with a revised proposal from Cooke, which contained two related changes: (i) Cooke reduced the proposed purchase price to $22 per share, and (ii) Cooke changed the proposed structure of the Acquisition in order to "transfer" the Omega Vessels and other assets in Omega's fishing fleet "to a qualifying U.S. citizen that is not an affiliate of Cooke in order to allow the vessels to maintain their U.S. fishing certificates."

59.     In response to Cooke's revised proposal, Omega demanded that Cooke pay Omega a $20 million termination fee in the event that MARAD declined to issue a favorable

letter-ruling that the Omega Vessels would be eligible for a fishery endorsement in the newly proposed post-Acquisition structure.  Cooke agreed.

60.     On October 5, 2017, Defendants finalized their agreement to enter into the Acquisition by executing several interrelated contracts that were part of the same overall merger transaction.

61.     First, Defendants Cooke and Omega entered into an Agreement and Plan of Merger ("Merger Agreement") pursuant to which Omega would become a wholly owned subsidiary of Cooke upon satisfaction of certain conditions—including, as set forth below, "MARAD Approval."  Section 4.05 of the Merger Agreement provides that, prior to closing, Omega would transfer title in the Omega Vessels to a newly created Omega subsidiary.  The placeholder name the parties chose for that subsidiary was the "MARAD Subsidiary," and it would eventually be known as Alpha VesselCo.  Section 9.04(b)(iii) provides that Cooke would pay Omega a $20 million "regulatory termination fee" in the event that MARAD Approval was not obtained.  Defendant Glenn Cooke signed the Merger Agreement on behalf of Cooke, and Defendant Scholtes signed the Merger Agreement on behalf of Omega.

62.     Second, pursuant to the express terms of the Merger Agreement, Defendants Omega and Holdings/Ocean Fleet Services (which had been incorporated by Cooke's attorneys two days earlier, on October 3, 2017) executed a Purchase and Sale Agreement (which the parties called the "MARAD Sale Agreement"), pursuant to which Omega agreed to sell 100% of the membership interests in the "MARAD Subsidiary" (*i.e.*, Defendant Alpha VesselCo) to Holdings/Ocean Fleet Services.  Section 4.05 of the Merger Agreement requires Omega to comply with the MARAD Sale Agreement.

63.     To help finance the Acquisition, Cooke needed to raise money, so it turned to Wall Street.  Also on October 5, 2017, Cooke executed a debt commitment letter with BMO Capital.  BMO Capital had been serving as a financial advisor to Omega in connection with its efforts to sell certain of its business lines.  To effectuate that debt transaction, Cooke created a new subsidiary called Cooke Omega Investments Inc. and had it co-issue $330 million in high-yield senior secured notes.  Cooke Omega Investments Inc., along with other Cooke entities including Omega, guaranteed the entire $330 million amount.  Holdings/Ocean Fleet Services was the other co-issuer but was liable up to only $28.75 million.  The debt transaction was underwritten by Defendant BMO Capital.  To generate investor interest in the Notes, Defendants prepared the confidential Offering Memorandum and the confidential Roadshow Presentation, both containing financial information and descriptions of the Acquisition.  Defendants then marketed and sold the Notes to accredited investors in New York and elsewhere.  Because the Notes were issued in a private placement, neither the U.S. Securities and Exchange Commission nor any Canadian securities regulator reviewed or approved the Offering Memorandum, Roadshow Presentation, or any other documents in connection with the offering, nor were any such documents filed with those regulators.  In addition to the Notes, Cooke raised $200 million from DNB via an equity bridge facility that would be repaid via incremental borrowings by Cooke Aquaculture.

64.     The Acquisition—including the shifting of the Omega Vessels as contemplated by the Merger Agreement and the MARAD Sale Agreement—closed on December 17, 2017.

65.     In total, Cooke paid approximately $500 million.  The transaction was the largest acquisition in Cooke's history.

**B.     The "Understanding" to Violate the AFA Citizenship Requirement**

66.     On information and belief, no later than June 2017, Cooke identified a potentially prohibitive obstacle to the Acquisition: the AFA Citizenship Requirement. Cooke and Omega recognized that the Acquisition as originally conceived—Cooke buying Omega and all of its assets—would render the Omega fishing fleet ineligible to operate in the U.S. commercial fisheries. Cooke and Omega further recognized that the inability to use that fleet to harvest menhaden in United States waters would be a disastrous outcome for both companies.

67.     Conversely, neither Cooke nor Omega was willing to entertain an arrangement that complied with the AFA prohibition on foreign control. For example, neither Cooke nor Omega was willing to sell the Omega Vessels to a bona fide third party in an arms-length transaction and purchase fish from that independent company at an arms-length price. Both companies viewed the Omega Vessels, and Omega's tight control over its vertically integrated menhaden harvesting and processing operations, as major drivers of Omega's value and as critical to its market dominance.

68.     Accordingly, Defendants entered into an agreement to restructure the proposed Acquisition in order to create a post-Acquisition ownership structure for the Omega Vessels that gave the illusion of independent ownership, while ensuring that Cooke and Omega would retain total control via a figurehead. Then the Defendants worked together to implement that plan by taking the steps below.

69.     Shortly after Cooke lowered its proposed purchase price to $22 per share, KDW sent Omega a draft merger agreement and a memorandum summarizing the key deviations from the originally contemplated transaction. Therein, Cooke proposed that the Omega Vessels be shifted to a new Omega subsidiary, which would then be "sold" to a holding company that, on paper, would not be an affiliate of Cooke or Omega.

70.     On October 3, 2017, KDW, acting at Cooke's direction, incorporated Holdings/Ocean Fleet Services, naming two directors: Cooke employees and Cooke Family members Seth and Gregory Dunlop. At approximately the same time, Seth Dunlop's job title at Cooke Aquaculture changed from "Special Projects" to "Global Business Development." Seth Dunlop received compensation in connection with his new figurehead role as a director of Holdings/Ocean Fleet Services.

71.     On October 5, 2017, Cooke and Omega executed the Merger Agreement and the MARAD Sale Agreement. In the Merger Agreement, Omega agreed it would transfer the Omega Vessels, along with its spotter planes and certain other assets, to an unnamed, newly formed Omega subsidiary. In the MARAD Sale Agreement, Omega agreed it would sell 100% of its interest in that subsidiary to Holdings/Ocean Fleet Services on the closing date of the Acquisition.

72.     Pursuant to the terms of the MARAD Sale Agreement, Omega would receive a total "purchase price" of $30 million for the assets it transferred to Holdings/Ocean Fleet Services. The $30 million price had several components. First, it included 20% of the outstanding common stock in Holdings/Ocean Fleet Services (valued in the MARAD Sale Agreement at $250,000). Second, it included a cash payment of $29,750,000. The cash payment consisted of $28,750,000 in proceeds from the Notes, plus a $1 million "cash equity contribution" supposedly from Seth Dunlop. On information and belief, Cooke and its affiliates and representatives provided or financed Mr. Dunlop's contribution on less-than-arms-length terms.

73.     Although the "purchase price" for the assets was $30 million, the Offering Memorandum states the fair value of the Holdings/Ocean Fleet Services assets is approximately

$48,850,000. In addition, although Omega "sold" the assets for $30 million, the Roadshow Presentation states Omega had invested $65 million over the past five years into refurbishing or replacing the vessels. The Roadshow Presentation also states that a single new vessel requires a $20 million outlay.

74.     On October 24, 2017, as contemplated in the Merger Agreement, Omega created Alpha VesselCo as an Omega subsidiary. Omega transferred legal ownership of the Omega Vessels, along with the other assets deployed in its commercial fishing operations, to Alpha VesselCo.

75.     In addition, Defendants executed a series of collateral written agreements that were intended to preserve the illusion of compliance with the AFA Citizenship Requirement, even while Defendants all understood that Cooke and Omega would nevertheless control the Omega Vessels, Holdings/Ocean Fleet Services, and Alpha VesselCo. These included: a "Fish Supply Agreement," pursuant to which Omega Protein agreed to "purchase" "100% of all menhaden harvested by [Alpha VesselCo] from the U.S. coastal waters of the Atlantic Ocean and the Gulf of Mexico"; a "Loaned Employee and Administrative Services Agreement," pursuant to which Omega Protein "provide[d]" certain of its employees to Alpha VesselCo through the end of 2018; and a "Stockholder Agreement" between Seth Dunlop and Omega which, among other provisions, stipulates that neither is permitted to transfer their equity interest in Defendant Holdings/Ocean Fleet Services without the consent of the other. Omega had thrived for decades without such a structure. Cooke initially proposed a straightforward acquisition of Omega, with no such gymnastics.

76.     The net effect of all these agreements was to convert a simple merger into a web of special-purpose entities, asset sales, interlocking executives, employment agreements, and

supply contracts. Under the original transaction structure, Cooke would buy Omega, let Omega operate the Omega Vessels using Omega personnel, and then own the fish Omega caught. Under the new structure, Omega would transfer the Omega Vessels to a new subsidiary for no reason, sell that subsidiary with no employees to a new holding company created by Cooke, install Cooke employees and relatives of the Cooke CEO as the executives of that holding company, borrow Omega employees to harvest the fish, and then "sell" all the fish back to Omega.

77.    The sole purpose of this circuitous approach was to facilitate false certifications of compliance with the AFA Citizenship Requirement and to facilitate a scheme to fraudulently induce the Government into allowing Defendants to take fish from U.S. waters.

78.    Defendants recognized the risk that MARAD would discover that the post-Acquisition ownership structure for the Omega Vessels violates the AFA Citizenship Requirement. So Cooke and Omega conditioned the closing of the Acquisition on "MARAD Approval," which they defined to mean "a letter ruling from the Citizenship Approval Officer of MARAD . . . which letter ruling contains a determination by MARAD that, after giving effect to the transactions contemplated by the MARAD Sale Agreement, the MARAD Subsidiary will continue to qualify as a U.S. Citizen that is eligible to document its vessels with a fishery endorsement, which approval may be conditional and subject to submittal of and final review of all executed documents by MARAD following the Closing." In addition, Omega demanded, and Cooke agreed to pay, a $20 million payment if the Acquisition failed to close because they could not obtain MARAD Approval.

79.    On information and belief, Defendants simultaneously entered into explicit and implicit informal agreements, understandings, and expectations pursuant to which Cooke, its

subsidiaries, and their representatives would exercise de facto control over the Omega Vessels, Alpha VesselCo, and Holdings/Ocean Fleet Services.

80.     One such understanding was that Omega's head of operations, Defendant Monty Deihl, would continue to control the Omega Vessels by controlling the business affairs of Alpha VesselCo.  In January 2018, on behalf of Defendant Alpha VesselCo, an Application for a Certificate of Registration to Transact Business in Virginia as a Foreign Limited Liability Company was submitted to the Commonwealth of Virginia State Corporation Commission (the "Virginia Registration Application").  The Virginia Registration Application was signed by Defendant Monty Deihl, who identified himself therein as the Vice President of *Alpha VesselCo*. In that Application, Deihl further affirmed that he had "the right and power to manage [Alpha VesselCo's] business affairs."  At the same time, Defendants represented that Mr. Deihl was the Vice President of Operations at Omega.  And according to Defendants' sworn statements to MARAD, there were *no* officers or directors of Alpha VesselCo.

81.     At the same time that Defendants held Deihl out to be a Vice President at Omega and a Vice President at Alpha VesselCo, they also held him out to be a Vice President of Holdings/Ocean Fleet Services.  They did so even though they swore to MARAD that Seth and Gregory Dunlop were the *only* officers, directors or other "individuals . . . authorized to act" on behalf of Defendant Holdings/Ocean Fleet Services.

82.     When raising $330 million in financing from private investors, Defendants were more forthcoming about their understanding that the Omega Vessels would be controlled by and operated for the benefit of Cooke and Omega.  Potential investors knew that conveying the Omega Vessels to a bona fide arms-length entity and buying back fish at an arms-length price would disrupt Cooke's commitment to vertical integration, raise Omega's costs, reduce Omega's

profits, and increase the risk that the Notes would experience a default. Accordingly, Defendants confidentially communicated their intent to retain control over the Omega Vessels and over Defendants Alpha VesselCo and Holdings/Ocean Fleet Services to prospective investors.

83.    For example, the Roadshow Presentation includes a diagram of the post-Acquisition pro forma corporate structure. The diagram depicts two corporate family trees. Cooke is at the top of one tree (which includes, among others, Omega, Omega Protein, Cooke Omega Investments, Cooke Aquaculture and its subsidiaries). Seth Dunlop is at the top of the second tree (which owns the Omega Vessels). A prominently displayed comment box explains: "Seth Dunlop is Glenn Cooke's nephew and a U.S. Citizen." Defendants advertised that "Seth Dunlop is Glenn Cooke's nephew" to reassure investors that the new owner of the Omega Vessels was merely a figurehead who was not truly independent and should be expected to take his orders from Glenn Cooke and to operate the Omega Vessels for the benefit of Cooke and Omega, the Notes' guarantor. Defendants advertised that "Seth Dunlop is a U.S. Citizen" to show that MARAD might be tricked into thinking he met the AFA Citizenship Requirement.

84.    Similarly, the Offering Memorandum states expressly that Seth Dunlop and Gregory Dunlop are Cooke employees and are related to the Cooke CEO. The Offering Memorandum provides the following descriptions of the "business experience" relevant to the appointments of Seth and Gregory Dunlop as the sole officers and directors of Holdings/Ocean Fleet Services.

> Seth Dunlop . . . has worked for Cooke Inc. for 11 years, and is currently in the role of Global Business Development. Mr. Dunlop also serves as a director of ISVesselco, Inc., a vessel-owning company on the West Coast of the United States. Mr. Dunlop is a nephew of Glenn Cooke, and the son of Gregory Dunlop.

> Gregory Dunlop has been Vice-President of Global Risk Management for Cooke Inc. since 2004. He is related by marriage to the Cooke family, and is the father of Seth Dunlop.

85.     The "Risk Factors" section of the Offering Memorandum states further: "Mr. [Seth] Dunlop, who owns 100% of VesselCo as of the date of this offering memorandum, has experience in the fishing industry, having provided strategic advice for the last five years in the development of the global fishing operations of Cooke Inc.  He is related by marriage to one of the family members that controls Cooke Inc."

86.     In a final acknowledgment that Defendants were committed to retaining control and that control by anyone *not* beholden to Cooke could imperil repayment of the Notes, investors were permitted to redeem their Notes for full payment of the aggregate principal amount plus 1% if Seth Dunlop sold his stake in Alpha VesselCo or sold substantially all its assets including the Omega Vessels (the "Change of Control Provision").  But there was a caveat.  The Change of Control Provision did not apply if the sale was to "an immediate family member of Seth Dunlop" who was both "a U.S. citizen" and "reasonably acceptable" to Cooke Omega Investments and to Omega.  The Change of Control Provision *also* did not apply if the sale was to "any entity controlled by any of Glenn, Gifford, or Michael Cooke and/or any Family Member thereof".  In other words, investors could accelerate Defendants' payment obligations on the Notes if Seth Dunlop were replaced by anyone who was *not* a figurehead controlled by Cooke and Omega.  The Change in Control Provision also effectively handcuffed Seth Dunlop by preventing him from selling to an arms-length counterparty.  Any rational potential buyer of Alpha VesselCo from Seth Dunlop would not agree to a deal that would trigger the Change of Control Provision and risk acceleration of Alpha VesselCo's guarantee under the Notes.

87.     The confidential investor materials further confirm that Cooke provided Alpha VesselCo and Holdings/Ocean Fleet Services with funding in the form of "working capital advances."  And Defendant Cooke Omega Investments consolidates the financial results of both

Holdings/Ocean Fleet Services and Alpha VesselCo into its *own* financial statements as a "variable interest entity." Furthermore, Cooke Omega Investments conspicuously stated in the Offering Memorandum that Seth Dunlop's 80% interest in Holdings/Ocean Fleet Services would be treated as a "non-controlling interest in accordance with applicable accounting rules" in Cooke Omega Investments' financial statements.

88.     Defendants established the Cooke Seafood USA Address as Alpha VesselCo's principal place of business, thereby co-locating it with Cooke Seafood USA and four Cooke subsidiaries in which Defendants Glenn Cooke and Seth Dunlop function (at least on paper) as, respectively, President and Vice President.

89.     In addition to sharing office space and officers with Cooke, Defendants Alpha VesselCo and Holdings/Ocean Fleet Services "share" Cooke's lawyers. Holdings/Ocean Fleet Services was incorporated by KDW, which served as Cooke's primary attorneys in the Acquisition, and which regularly represents Omega. On information and belief, when KDW incorporated Holdings/Ocean Fleet Services, it identified Defendants Seth and Gregory Dunlop as the sole officers and directors, and it did so at the direction of Cooke, Omega, Glenn Cooke, Scholtes, Seth Dunlop, and Gregory Dunlop. In addition, the same attorney at K&L Gates who represented Cooke in the Acquisition and when seeking MARAD approval also represented Holdings/Ocean Fleet Services in connection with the Purchase and Sale Agreement. Pursuant to section 6.04 of that agreement, any notices to be sent to Holdings/Ocean Fleet Services were to be sent to "Seth Dunlop c/o K&L Gates LLP" at his attention.

90.     Furthermore, on information and belief, Defendants Seth Dunlop, Gregory Dunlop, Glenn Cooke, Cooke, and Cooke Aquaculture are participants and collaborators in a second, structurally similar scheme to take fish from United States waters in violation of the

AFA Citizenship Requirement. In that scheme, Glenn Cooke is "President" of Cooke subsidiary Icicle Seafoods and Seth and Gregory Dunlop are "Governors" of ISVesselCo and other entities located at the Icicle Seafoods Address, which in turn function as the nominal owners of fishing vessels controlled by Cooke and its subsidiary Icicle Seafoods.

   **C.   After the Acquisition, Cooke and Omega Continue to Control the Vessels They "Sold"**

   91.    The post-Acquisition operation of the Omega Vessels functions exactly as Defendants planned: Cooke, Omega, and their affiliates and representatives exercise total control over the Omega Vessels, Holdings/Ocean Fleet Services, and Alpha VesselCo. Defendant Seth Dunlop continues to be a Cooke employee while simultaneously "serving" as the figurehead Chairman and CEO of Holdings/Ocean Fleet Services. Defendant Gregory Dunlop continues to be a Cooke Vice President while simultaneously "serving" as the Secretary and Treasurer of Holdings/Ocean Fleet Services. Defendant Monty Deihl continues to be an Omega Vice President while simultaneously "serving" as Vice President of Holdings/Ocean Fleet Services and Alpha VesselCo.

   92.    Cooke and Omega control virtually every aspect of the Omega Vessels' fishing activities, operations, and staffing.

   93.    Cooke and Omega—not Alpha VesselCo and not Seth Dunlop—decide where and when the Omega Vessels will fish. Cooke and Omega's control over fishing operations is so pervasive that Cooke and Omega have specifically directed the Omega Vessels to exceed limitations on catch quotas.

   94.    For example, the Atlantic States Marine Fisheries Commission ("ASMFC")—an interstate compact acting under an express grant of statutory authority from Congress— periodically establishes a cap on annual menhaden catch in the Chesapeake Bay (the "Bay Cap").

In the 2019 fishing season, Omega decided it didn't like the ASMFC's Bay Cap and didn't want to honor it. So Omega directed the Omega Vessels to exceed the Bay Cap, which they did. When the Commissioner of the Virginia Marine Resources Commission became aware of this misconduct, he expressed his concern in a letter dated September 3, 2019, directed to "Monty Deihl" at "Omega Protein, 342 Menhaden Rd., Reedville, VA, 22539." Seth Dunlop and Alpha VesselCo were not copied on that letter, even though Alpha VesselCo is supposedly the entity doing the fishing and Seth Dunlop is supposedly the person who controls Alpha VesselCo.

95.    Thereafter, the ASMFC issued a non-compliance finding against the Commonwealth of Virginia and asked then-U.S. Commerce Secretary Wilbur Ross to impose a moratorium on the menhaden reduction fishery in the Chesapeake Bay. In response, Omega Protein—not Alpha VesselCo, and not Seth Dunlop—submitted to Secretary Ross a lengthy written objection on Omega Protein letterhead. The opening statement of Omega Protein's letter of objection states: "Omega Protein, Inc. . . . is *the sole entity* impacted by the Chesapeake Bay reduction fishery cap." (emphasis added). In Omega's *own words* to the United States Secretary of Commerce, therefore, Omega is "the sole entity impacted" by the Bay Cap even though Alpha VesselCo is supposedly doing the fishing and then selling the fish *it* "catches" to Omega at a supposedly arms-length price, all pursuant to a supposedly arms-length Fish Supply Agreement. Omega's submission to Secretary Ross also refers to "Omega Protein's bay harvest"—not Alpha VesselCo's harvest—and defended *Omega's* decision to intentionally overfish the Chesapeake Bay on the grounds that bad weather in the ocean left *Omega* "with hard choices" about where to deploy the Omega Vessels to fish. Omega admitted that "[t]he company choose [sic]" to breach the Bay Cap. Omega's submission made no mention of Alpha VesselCo or of any involvement by Seth Dunlop in Omega's "hard choices" about where to fish—because Omega makes those

choices, not figurehead Seth Dunlop the nephew of the Cooke CEO. Secretary Ross then upheld the moratorium on fishing menhaden in the Chesapeake Bay.

96.     Omega has a history of violating laws that limit its operations or its profits. For example, Omega for years discharged pollutants and harmful amounts of oil into U.S. waters from a processing plant in Virginia, resulting in Omega pleading guilty to two felony violations of the Clean Water Act. Under a plea agreement, Omega paid a $5.5 million fine, made a $2 million contribution to an environmental fund, and was sentenced to a term of probation that (following an extension) ended in January 2020. Omega did not learn its lesson. Just a few years after it pled guilty, another Omega plant dumped wastewater into a canal, resulting in another guilty plea to two more felony violations of the Clean Water Act. Pursuant to the terms of the second plea agreement, Omega paid a fine of $1 million and made a $200,000 charitable contribution.

97.     Omega controls other relevant lobbying efforts as well. Omega—not Alpha VesselCo—petitioned for Marine Stewardship Council ("MSC") certification of the Atlantic menhaden purse seine fishery and the Gulf menhaden purse seine fishery. When other industry representatives objected, lawyers at KDW responded on behalf of "Client[] Omega Protein Corporation," again with no mention of Alpha VesselCo.

## III.   THE FRAUDULENT SCHEME

98.     Defendants defrauded the Government by falsely certifying that they complied with the AFA Citizenship Requirement and by concealing from MARAD numerous facts that were material to MARAD's citizenship determinations under the Act. The goal of their scheme was to fraudulently obtain fish in Atlantic and Gulf waters and fraudulently obtain the fishery endorsements issued to the Omega Vessels every year following the Acquisition.

A.    **Cooke Requests Fishery Endorsement Eligibility Determinations in 2017**

99.    On July 14, 2017, the law firm K&L Gates LLP ("K&L Gates"), counsel to Cooke, submitted a letter to MARAD on behalf of Cooke (the "July Submission"), requesting confirmation that the Omega Vessels would be eligible to receive fishery endorsements upon consummation of the transactions contemplated by the Merger Agreement and the MARAD Sale Agreement.  K&L Gates and MARAD, including MARAD's Citizenship Approval Officer, also communicated by email and phone to discuss the July Submission.  On information and belief, the July Submission and the subsequent communications falsely certified that there was no understanding by which Alpha VesselCo and Holdings/Ocean Fleet Services would be controlled by a non-citizen.  On information and belief, the July Submission and the subsequent communications also failed to disclose the connections between the "MARAD Subsidiary", Seth Dunlop, and Gregory Dunlop on the one hand, and Cooke and Omega on the other hand, including that Seth Dunlop and Gregory Dunlop were Cooke employees and were closely related to the Cooke CEO.

100.    On September 29, 2017, K&L Gates received preliminary confirmation from the MARAD Citizenship Approval Officer that, upon consummation of the transactions described in the July Submission and subsequent correspondence between K&L Gates (on behalf of Cooke) and MARAD, the Omega Vessels would be eligible to receive fishery endorsements after the Acquisition.  Less than one week later, the parties executed the Merger Agreement and the MARAD Sale Agreement.

101.    On October 19, 2017—two weeks after the execution of the Merger Agreement and the MARAD Sale Agreement—K&L Gates, acting on behalf of Cooke, submitted a second letter to MARAD (the "October Submission"), which requested a preliminary determination that

the Omega Vessels would be fishery-endorsement eligible after the Acquisition closed (*i.e.,* "MARAD Approval" under the Merger Agreement).

102.    The October Submission included as an attachment an unexecuted Affidavit of United States Citizenship (the "Citizenship Affidavit") for "Alpha VesselCo, LLC" and "Alpha VesselCo Holdings, Inc."  The Citizenship Affidavit purported to support fishery endorsement eligibility determinations for approximately 35 of the Omega Vessels listed in an accompanying schedule.  The affiant is Defendant Seth Dunlop.

103.    On information and belief, the October Submission falsely certified that there was no understanding by which Alpha VesselCo and Holdings/Ocean Fleet Services would be controlled by a non-citizen.  On information and belief, the October Submission also failed to disclose the connections between Seth Dunlop, Gregory Dunlop, Alpha VesselCo, and Holdings/Ocean Fleet Services on the one hand, and Cooke and Omega on the other hand, including that Seth Dunlop and Gregory Dunlop were Cooke employees and were closely related to the Cooke CEO.

104.    By letter dated December 6, 2017, MARAD responded to the October Submission, stating: "Based on your description of the proposed transactions and the documents you submitted, the fishing industry vessels concerned will be eligible for documentation with fishery endorsements upon their acquisition by Alpha VesselCo."  MARAD further directed that, prior to the issuance of any final "fishery endorsement eligibility approval" for the Omega Vessels, MARAD must receive "executed copies" of documents "substantively consistent with the *pro forma* documents" in the October Submission, "as well as the representations contained in your correspondence in this matter."

### B.    Defendants Present Annual Citizenship Certifications

105.    On information and belief, Defendants presented, caused to be presented and/or conspired to cause the presentation of, fishery endorsement applications substantially similar to the October Submission (including citizenship affidavits substantially similar to the Citizenship Affidavit), for each of the Omega Vessels in 2018, 2019, 2020, and 2021.

106.    On information and belief, in 2018, 2019, 2020, and 2021, notwithstanding the requirement of annual MARAD review and approval, Defendants obtained from the Coast Guard renewals of the fishery endorsements for the Omega Vessels using an online, automated process. Each year, Defendants used the publicly accessible online "USCG Vessel Documentation Payment Form"[4] to renew the fishery endorsements for the Omega Vessels.  On that online form, Defendants simply entered their contact information and the vessel number and clicked a button for "Certificate of Documentation Renewal," which brought up a "Certification" window with a checkbox and the following text: "I CERTIFY THAT THE RECITATIONS CONCERNING THE VESSEL: NAME, DIMENSIONS, PROPULSION, OWNERSHIP, HAILING PORT, RESTRICTIONS, ENTITLEMENTS, REMARKS AND ENDORSEMENTS CONTAINED IN THE CERTIFICATE OF DOCUMENTATION REMAIN ABSOLUTELY THE SAME."  After checking that box and clicking "Continue", Defendants entered their payment information ($26.00 per vessel), clicked "Review and Submit Payment", and eventually received a "Confirmation" that each renewed Certificate of Documentation would be sent to the vessel owner.  Using this online process, Defendants were able to renew the Omega Vessels' fishery endorsements unilaterally, without actual approval by any Government employee.

---

[4] *See* USCG Vessel Documentation Payment Form, *at* https://www.pay.gov/public/form/entry/101/.

107.    By invoking earlier submissions, each renewal certification for each Omega

Vessel was tainted by the false and fraudulent statements and omissions in the 2017 submissions.

Furthermore, each renewal certification was independently false and fraudulent because it

misrepresented that, during the previous 12 months and moving forward, there was no

understanding that Cooke and Omega would control Alpha VesselCo and Holdings/Ocean Fleet

Services and that Cooke and Omega did not actually control them.  For example, each renewal

certification submitted in early 2020 was false and fraudulent because it did not disclose that,

during the summer of 2019, the Defendants had an understanding that Cooke and Omega would

control Alpha VesselCo and Holdings/Ocean Fleet Services, nor did they disclose that Cooke

and Omega actually controlled them by, among other things, deciding that the Omega Vessels

would exceed the Bay Cap in 2019.  Each annual renewal certification also failed to disclose that

Seth Dunlop and Gregory Dunlop were employed by Cooke and were closely related to the

Cooke CEO.

108.    Therefore, from the date of the October Submission to the present, Defendants

have presented or caused to be presented to MARAD hundreds of fishery endorsement

applications.

109.    In each of the 2018, 2019 and 2020 fishing seasons, the Omega Vessels, operating

at the direction and for the benefit of Cooke and Omega, have continued to harvest

approximately 75% of the total annual U.S. Atlantic menhaden catch and approximately 60% of

the total annual U.S. Gulf menhaden catch.

## C.    Defendants' Citizenship Affidavits Are Fraudulent

110.    Defendants presented or caused to be presented false claims to the Government by

(i) submitting and/or directing the submission of the October Submission and the Citizenship

Affidavit on behalf of Defendants Alpha VesselCo and Holdings/Ocean Fleet Services, in

support of a fishery endorsement eligibility determination for the Omega Vessels, and

(ii) submitting and/or directing the submission of substantially similar citizenship affidavits and

supporting submissions on an annual basis thereafter, in order to fish in U.S. waters.

111.    Defendants made or caused to be made false statements and omissions material to

their false claims by attesting under penalty of perjury—and/or directing such attestation—that

Alpha VesselCo and Holdings/Ocean Fleet Services are not subject to prohibited foreign control,

and by concealing from MARAD—and/or by directing such concealment—of the factual

evidence that contradicts that representation.

112.    Defendants conspired to submit false claims and to make false statements material

to false claims by agreeing to and executing a scheme in which Defendants would (a) create an

ownership structure for the Omega Vessels that gave Cooke and Omega de facto control;

(b) falsely certify to MARAD that the AFA Citizenship Requirement was satisfied; (c) withhold

material information from MARAD; and (d) use the Omega Vessels to harvest fish from U.S.

waters under the control of Cooke and Omega.

1.    ***False and Fraudulent Statements and Material Omissions***

113.    Seth Dunlop's Citizenship Affidavit contains the following false representations,

which track the language of the AFA, and which are asserted as to each of Defendants Alpha

VesselCo and Holdings/Ocean Fleet Services:

1)    "Title to at least seventy-five percent (75%) of the interest" therein is "vested in
     Citizens of the United States free from any trust or fiduciary obligation in favor of
     any person not a Citizen of the United States."

2)    "Through no contract or understanding is it so arranged that more than twenty-
     five percent (25%) the voting power [therein] may be exercised, directly or
     indirectly, in behalf of any person who is not a Citizen of the United States."

3)    "By no means whatsoever is any interest [therein] in excess of twenty-five percent
     (25%) conferred upon or permitted to be exercised by any person who is not a
     Citizen of the United States."

114.    Those certifications were false.  Defendants had a shared understanding and expectation that Cooke and Omega would have the ability to exert, and would in fact exert, de facto control over the Omega Vessels, Alpha VesselCo, and Holdings/Ocean Fleet Services.

115.    The following certifications in the Citizenship Affidavit are *also* false:

1)  That Alpha VesselCo, LLC is a member-managed limited liability company "with no officers or directors."

2)  That Holdings/Ocean Fleet Services "qualifies as a Citizen of the United States" under the Act.

3)  That "the names of the Chief Executive Officer, by whatever title, the Chairman of the Board of Directors, President, Vice Presidents, Officers, members of the Board or Directors of [Holdings/Ocean Fleet Services] or other individuals authorized to act in the absence or disability of such individuals are as follows:"

| Name | Title | Date and Place of Birth |
|------|-------|------------------------|
| Seth Dunlop | Chief Executive Officer, Chairman of the Board, Director | October 14, 1988; Conyers, Georgia |
| Gregory Dunlop | Secretary and Treasurer, Director | November 27, 1968; Pomona, California |

116.    In fact, Omega Protein Vice President Monty Deihl either was, or functioned as, the Vice President of both Holdings/Ocean Fleet Services and Alpha VesselCo, LLC.  And, according to his representation in the January 23, 2018 Virginia Registration Application, Mr. Deihl had "the right and power to manage [Alpha VesselCo's] affairs."  Most fundamentally, for all the reasons set forth herein, neither Alpha VesselCo nor Holdings/Ocean Fleet Services qualified as a Citizen of the United States under the AFA.

117.    In addition to failing to disclose the shared understanding and expectation regarding control, the Citizenship Affidavit also *omits* the following material facts:

1)  Seth Dunlop is a Cooke employee, and he has been a Cooke employee continuously since 2006, when Mr. Dunlop was approximately 18 years old. Concurrent with the 2017 transfer of the Omega Vessels, Mr. Dunlop's job title changed to "Global Business Development" at Cooke Aquaculture.

2) Seth Dunlop is the nephew of Glenn Cooke, the Chief Executive Officer of Cooke, and—through his mother, Glenn Cooke's sister—he is also a member of the Cooke Family, which privately holds, beneficially owns and controls Cooke.

3) Seth Dunlop and his uncle Glenn Cooke are, respectively, the Vice President and President of at least four additional Cooke affiliates, all of which are co-located with Alpha VesselCo at the Cooke Seafood USA Address.

4) The Secretary and Treasurer of Holdings/Ocean Fleet Services, Gregory Dunlop, has worked at Cooke since 2004, where his title is Vice President Global Risk Management.

5) Gregory Dunlop—through his wife, Glenn Cooke's sister—is Seth Dunlop's father and is also a member of the Cooke Family.

6) Seth and Gregory Dunlop serve as co-directors and officers of multiple additional fishing vessel-owning entities co-located with Cooke Subsidiary Icicle Seafoods at the Icicle Seafoods Address.

7) The circumstances surrounding Seth Dunlop's purported $1 million equity contribution.

8) The circumstances surrounding Cooke and Omega deriving a significantly disproportionate amount of the economic benefit from the ownership and operation of the Omega Vessels.

9) The circumstances surrounding Cooke and Omega absorbing the costs and normal business risks associated with ownership and operation of the Omega Vessels.

118.    In the context of a certification that Alpha VesselCo and Holdings/Ocean Fleet Services are not de facto controlled by foreign citizens, the above statements are misleading by omission. They fail to disclose that Seth Dunlop and Gregory Dunlop work for, owe duties to, and are closely related to the foreign citizens that had just paid $500 million to acquire Omega's fishing business. They fail to disclose that Seth and Gregory Dunlop's appointments as officers and directors of Holdings/Ocean Fleet Services were made on the shared understanding that those appointments were in name only. They fail to disclose that the Dunlops' ability and incentive to act as independent officers and directors was seriously impaired. And they fail to provide a full picture of the economic relationship between the Defendants. At best, therefore, the statements in the Citizenship Affidavit are misleading half-truths.

119.   On information and belief, each citizenship affidavit submitted to MARAD in 2017, 2018, 2019, 2020, and 2021 contains the same false certifications, false statements, and misleading half-truths, and omits the same material information.  On information and belief, each certification in each renewal in 2018, 2019, 2020, and 2021 contains, invokes, relies on, or is tainted by the same false certifications, false statements, and misleading half-truths, and omits the same material information, including regarding facts that occurred in the preceding 12 months.

120.   The material and misleading deficiency of Defendants' false statements and half-truths is readily apparent, especially when compared with the information Defendants provided to prospective investors in the Notes.  Investors, but not MARAD, were told that Seth Dunlop "work[s] for Cooke"; had worked for Cooke since 2006 (when Mr. Dunlop turned 18 years old); was the "nephew of Glenn Cooke", "related" to "one of the family members that controls Cooke Inc." and the "son of Gregory Dunlop"; and that "he also serves as a director of ISVesselCo, Inc., a vessel-owning company on the West Coast of the U.S."  And investors, but not MARAD, were told that Gregory Dunlop had "been Vice-President of Global Risk Management for Cooke Inc. since 2004" and "is related by marriage to the Cooke family."

121.   The information *omitted* from each submission to MARAD is *emphasized* in the Offering Memorandum and the Roadshow Presentation as part of the business case to invest in the Acquisition.  On its face, that information communicates Defendants' intention to control the nominal owner of the Omega Vessels and clarifies the reasons why investors should trust that Defendants would in fact continue to exercise control even though the vessels were "sold".

122.   Defendants also failed to fully inform MARAD regarding other "indicia" of impermissible foreign control, including (i) that the nominal owner of the Omega Vessels shared

office space with Cooke affiliates and shared attorneys with Cooke and Omega; (ii) that Cooke and its subsidiaries derived disproportionate financial benefit from Holdings/Ocean Fleet Services, Alpha VesselCo, and the operation of the Omega Vessels, (iii) the circumstances regarding the start-up capital for Holdings/Ocean Fleet Services, including Omega's guarantee of the entire amount of the Notes, and the circumstances of Seth Dunlop's $1 million "equity investment" in Holdings/Ocean Fleet Services.

123.    On information and belief, Defendants omitted all of that information from the Citizenship Affidavit because they knew it would undermine their false and fraudulent attestation that Alpha VesselCo and Holdings/Ocean Fleet Services are not subject to any form of prohibited control.

### 2.    *Materiality*

124.    If Defendants had *not* falsely represented compliance with the AFA Citizenship Requirement and had not omitted material information, as described above, the Omega Vessels would not have received preliminary or actual approval to fish in U.S. waters, and they would not have fished in U.S. waters in 2018, 2019, 2020, and 2021.

125.    Under the AFA, compliance with the AFA Citizenship Requirement is an express and absolute condition of receiving permission to take fish from U.S. waters, and MARAD is statutorily required to enforce it "rigorously."

126.    Consistent with that mandate, MARAD devotes significant resources to monitoring compliance with the AFA Citizenship Requirement. A dedicated Citizenship Approval Officer works in the MARAD Office of Chief Counsel. MARAD maintains an ongoing compliance procedure, implemented and overseen by the Citizenship Approval Officer, including: (i) mandatory annual submissions of a citizenship affidavit (sworn under penalty of perjury); (ii) mandatory supporting submissions; (iii) a continuing obligation in vessel owners to

inform the MARAD Citizenship Approval Officer in writing within 30 days of any changes in their citizenship status; and (iv) broad authority in MARAD to "review any contract or agreement that may, by any means whatsoever, result in a transfer of control to a Non-Citizen." And MARAD Regulations grant MARAD discretion to condition prospective fishery endorsement eligibility on a vessel owner's timely compliance with its AFA Citizenship Requirement submission and notification obligations.

127.    As required by the Act and by its own implementing regulations, MARAD enforces the AFA Citizenship Requirement ex ante by refusing to allow fishery endorsements for companies that MARAD has reason to believe are controlled by foreign citizens. The history of a fishing vessel called the Stellar Sea demonstrates MARAD's ex ante approach. Just before the AFA became effective in 2001, a foreign citizen (a seafood company called Peter Pan Seafoods) was using the Stellar Sea. Once the AFA became effective, the Stellar Sea was sold to a U.S. shell. The shell then leased or chartered the Stellar Sea back to a U.S. entity called Stellar Seafoods—but Peter Pan controlled that entity, and Peter Pan guaranteed all payments owed under the charter lease. Peter Pan was thus attempting to launder the vessel through a U.S. shell while retaining de facto control. MARAD determined that the arrangement had the effect of granting impermissible foreign control over the vessel. MARAD required several changes to the charter arrangement before MARAD would certify that it complied with the AFA Citizenship Requirement. Of greatest relevance here, MARAD required that no "employee" of the foreign citizen could also serve as a director of Stellar Seafoods, whose subsidiary would charter and operate the vessel. Regarding the Omega Vessels, of course, Seth Dunlop serves in just such a prohibited dual role as both an employee of non-citizen Cooke and a director of Holdings/Ocean Fleet Services, whose subsidiary owns and purports to operate the Omega Vessels.

128.    MARAD and the Coast Guard also enforce violations of the AFA Citizenship Requirement ex post.  For example, after the Stellar Sea parties complied with MARAD's no-foreign-entity-employee demand and received a fishery endorsement, the vessel owner received an unsecured loan from the foreign citizen but failed to disclose it to MARAD.  When MARAD discovered the new arrangement, MARAD raised concerns about a violation of the AFA Citizenship Requirement and required the parties to restructure their debt.  Instead of complying, the parties gave up and sold the vessel.

129.    More recently, in February 2012, the Coast Guard approved commencement of a civil penalty assessment process against Trico to collect penalties under 46 U.S.C. § 12151(a) for violating the vessel citizenship requirement for coastwise endorsement eligibility. *See supra* ¶ 53.  The Coast Guard assessed a separate penalty for each "Vessel Violation Day"—that is, for each day that a vessel owned by the Defendants was documented with an endorsement for which the Defendants were, in fact, ineligible.  The NVDC also recommended that Trico's endorsements be cancelled and invalidated.

130.    As a general matter, responsibility for enforcing the AFA Citizenship Requirement is split between MARAD and the Coast Guard, with MARAD responsible for ex ante enforcement (i.e., when applications are submitted), and the Coast Guard responsible for ex post enforcement (i.e., after a potential violation comes to light).

131.    If Defendants had admitted that they had an understanding and expectation that Cooke and Omega could and would exercise de facto control over the Omega Vessels, Alpha VesselCo, and/or Holdings/Ocean Fleet Services, MARAD would have determined that Defendants had violated the AFA's robust prohibition on foreign control and would have determined that none of the Omega Vessels could take fish from U.S. waters.

132.    Similarly, if MARAD had been advised of the omitted material facts set forth above, either individually or collectively, including that Seth Dunlop and Gregory Dunlop are Cooke employees and are closely related to the Cooke CEO, MARAD would have determined that Defendants had violated the AFA's robust prohibition on foreign control and would have determined that none of the Omega Vessels could take fish from U.S. waters.

3.    *Defendants' Knowledge*

133.    Each Defendant knew the AFA Citizenship Requirement was being violated, knew that the certifications to MARAD of compliance with the AFA Citizenship Requirement were false, knew that MARAD would not have allowed the Omega Vessels to fish in U.S. waters in the absence of compliance with the AFA Citizenship Requirement, knew that the citizenship submissions omitted material information, and knew that MARAD would not have allowed the Omega Vessels to fish in U.S. waters if that omitted information had been disclosed.

134.    Each Defendant knew the certifications in the citizenship submissions were false. Each Defendant knew that every Defendant agreed, understood, planned, and expected that Cooke and Omega could and would exercise de facto control over Alpha VesselCo, Holdings/Ocean Fleet Services, Seth Dunlop, and the Omega Vessels, in violation of the AFA Citizenship Requirement. Each Defendant knew and understood that Seth Dunlop would cede de facto control over Alpha VesselCo, Holdings/Ocean Fleet Services, and the Omega Vessels to Omega, Deihl, Glenn Cooke, and others at Cooke and Omega.

135.    Defendants Glenn Cooke, Seth Dunlop, and Gregory Dunlop have direct, personal knowledge of their familial connections to each other, their respective terms of employment at Cooke, their respective beneficial interests in Cooke, and the understandings, agreements, and expectations between themselves, and with Defendants Omega, Deihl and Scholtes, regarding

Seth Dunlop's titular ownership of an 80% interest in Holdings/Ocean Fleet Services and Gregory and Seth Dunlop's titular roles within that entity.

136.    Seth Dunlop knew that the plan was for him to cede de facto control to Cooke and Omega, and he knew that he does not in fact exercise control. Glenn Cooke knew the same and agreed to select Seth Dunlop as the figurehead because he knew Seth Dunlop would agree to the plan. Gregory Dunlop knew that the plan was for his son, the CEO and Chairman of Holdings/Ocean Fleet Services, to cede de facto control as a figurehead, and Gregory Dunlop knew that his son does not in fact exercise control.

137.    All five individual Defendants—Glenn Cooke, Seth Dunlop, Gregory Dunlop, Scholtes, and Deihl (the "Individual Defendants")—personally participated in the development, negotiation, and execution of the scheme to convey the Omega Vessels to a shell, convey 80% ownership to Seth Dunlop as a figurehead, and permit Cooke, Omega, Glenn Cooke, Scholtes, and Deihl to exercise de facto control.

138.    Each Individual Defendant had direct, personal knowledge that Cooke and Omega in fact control Holdings/Ocean Fleet Services, Alpha VesselCo, and the Omega Vessels, all of which are operated for the benefit of Cooke and its subsidiaries and affiliates. Each Individual Defendant had direct, personal knowledge that Omega and its representatives direct and control the day-to-day operations of the Omega Vessels. Each Individual Defendant had direct, personal knowledge that Defendant Seth Dunlop was appointed to serve as the titular owner—and Defendants Seth and Gregory Dunlop were appointed to as the titular directors—of Alpha/Ocean Fleet Services because Defendants agreed, understood, planned, and expected that they would cede de facto control over Alpha/Ocean Fleet Services, Alpha VesselCo and the Omega Vessels to Cooke and its subsidiaries and representatives, and to Glenn Cooke.

139.    During the process of negotiating and structuring the Acquisition and the Notes, each Defendant understood or became aware that (a) the AFA Citizenship Requirement was a central component of obtaining MARAD approval; (b) the AFA Citizenship Requirement prohibits de facto control by foreign citizens; (c) MARAD would not grant approval if MARAD knew of Defendants' understanding that Cooke and Omega would exercise de facto control; and (d) MARAD would not grant approval if MARAD knew of the connections between Defendants. For example, the Offering Memorandum describes the "requirement[]" under the AFA and MARAD Regulations that the entity owning the Omega Vessels must be "controlled by U.S. citizens." More broadly, any reasonable industry participant in Defendants' shoes would have been actually aware of that reality, would have been deliberately ignorant of it, or would have been acting in reckless disregard of it.

140.    Each Defendant's knowledge that the information they omitted is material can also be readily inferred from the strategic manner in which Defendants confidentially provided and emphasized that information to potential investors on the one hand but concealed it from MARAD, on the other.

141.    Defendants' knowledge that Seth Dunlop's employment at Cooke is material can be plausibly further inferred from a recent attempt to cover up his employment. In or after March 2020, counsel for Alpha VesselCo learned that the undersigned counsel was investigating a potential violation of the AFA Citizenship Requirement involving the Omega Vessels. Shortly thereafter, Seth Dunlop or someone acting on his behalf began altering or destroying certain data that might suggest he was employed at Cooke Aquaculture. By August 2020, the data was gone.

142.    Defendant Glenn Cooke's knowledge should be imputed to the entire "Cooke family of companies," including Defendants Cooke, Cooke Aquaculture, Cooke Omega

Investments, Cooke Seafood USA, and Omega, because he is the CEO of "the Cooke family of companies," including Cooke and Cooke Aquaculture, because he controls them, and because he used them to finance and execute the Acquisition and the fraudulent scheme.

143.    Each Individual Defendant's knowledge should be imputed to Alpha VesselCo and Holdings/Ocean Fleet Services because each Individual Defendant owns or controls those entities either in name or in fact.

144.    Defendants BMO Capital, Cooke, Cooke Omega Investments, Alpha VesselCo, and Holdings/Ocean Fleet Services had actual knowledge of the material facts regarding Cooke and Omega's control over the Omega Vessels because they communicated those facts, and their importance, in the Offering Memorandum and the Roadshow Presentation, in order to finance the Acquisition by simultaneously assuring investors that Cooke and Omega would control the Omega Vessels and that the Omega Vessels would be approved by MARAD as compliant with the AFA Citizenship Requirement.

145.    Further, on information and belief, defendant BMO Capital had actual knowledge of, or acted with deliberate indifference and reckless disregard as to whether, the Acquisition it financed constituted a scheme to defraud the United States.  In its dual capacity as former advisor to Omega in connection with its pre-Acquisition efforts to execute a strategic sale of certain of its business lines, and as the Initial Purchaser and underwriter of the Notes, BMO Capital acquired a detailed understanding of Omega's operations, and also of the terms of the Acquisition, including the details of the "MARAD Approval" requirement and the plan to allow Cooke and Omega to continue to exert de facto control, and also of the information and reassurances that BMO Capital itself provided to prospective investors on that score.

## COUNT I

### Violation of the False Claims Act:  Presentation of False Claims

### (31 U.S.C. § 3729(a)(1)(A))

146.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 145 of this Complaint as if fully set forth in this Count I.

147.    From 2017 to 2021, Defendants have falsely certified to MARAD and the Coast Guard that the Omega Vessels, Alpha VesselCo, and/or Holdings/Ocean Fleet Services comply with the AFA Citizenship Requirement.

148.    Defendants knew that their representations were false or acted in deliberate ignorance and/or with reckless disregard of the truth of their certifications.

149.    From 2017 to 2021, Defendants' submissions to MARAD and the Coast Guard intentionally omitted material information regarding control over the Omega Vessels, Alpha VesselCo, and/or Holdings/Ocean Fleet Services.

150.    Defendants knew that the falsity of their certifications, as well as the information omitted from their submissions to MARAD, was material to their AFA citizenship status or acted in deliberate ignorance and/or with reckless disregard as to the materiality of that omitted information.

151.    As Defendants knew or were deliberately ignorant of or acted in reckless disregard of, if the United States had been aware of the falsity of the statements and representations in the citizenship submissions, or had been aware of the information omitted from those submissions, the United States would not have determined that the post-Acquisition ownership structure satisfies the AFA Citizenship Requirement, would not have determined that the Omega Vessels are eligible to receive fishery endorsements, and would not have issued

fishery endorsements to the Omega Vessels in 2018, 2019, 2020, or 2021, meaning that Defendants would not have taken millions of dollars of fish each year from U.S. waters.

152.     Defendants thus knowingly presented or caused to be presented false or fraudulent claims to the United States.

153.     By reason of Defendants' presentation of false or fraudulent claims, the United States has been damaged and continues to suffer damage.

154.     Defendants are therefore liable to the United States for a civil penalty under the False Claims Act for each of the false or fraudulent claims described herein, plus three (3) times the amount of damages which the Government has sustained.

## COUNT II

**Violation of the False Claims Act: Making or Using a False Record or Statement**

**(31 U.S.C. § 3729(a)(1)(B))**

155.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 154 of this Complaint as if fully set forth in this claim for relief.

156.    From 2017 to 2021, Defendants made or used false statements to MARAD and the Coast Guard that the Omega Vessels, Alpha VesselCo, and/or Holdings/Ocean Fleet Services comply with the AFA Citizenship Requirement.

157.    Defendants knew that the statements were false or acted in deliberate ignorance and/or with reckless disregard of the truth of the statements.

158.    From 2017 to 2021, Defendants' submissions to MARAD and the Coast Guard intentionally omitted material information regarding control over the Omega Vessels, Alpha VesselCo, and/or Holdings/Ocean Fleet Services.

159.    Defendants knew that the falsity of the statements, as well as the information omitted from their submissions to MARAD, was material to their AFA citizenship status and or acted in deliberate ignorance and/or with reckless disregard as to the materiality of that false or omitted information.

160.    As Defendants knew or were deliberately ignorant of or acted in reckless disregard of, if the United States had been aware of the falsity of the statements and representations in the citizenship submissions, or had been aware of the information omitted from those submissions, the United States would not have determined that the post-Acquisition ownership structure satisfies the AFA Citizenship Requirement, would not have determined that the Omega Vessels are eligible to receive fishery endorsements, and would not have issued

fishery endorsements to the Omega Vessels in 2018, 2019, 2020, or 2021, meaning that Defendants would not have taken millions of dollars of fish each year from U.S. waters.

161.     Defendants thus knowingly or with deliberate ignorance or reckless disregard of the truth made, used, and caused to be made and used, false records and statements material to false or fraudulent claims presented to the United States.

162.     Defendants are therefore liable to the United States for a civil penalty under the False Claims Act for each of the false or fraudulent claims described herein, plus three (3) times the amount of damages which the Government has sustained.

## COUNT III

**Violation of the False Claims Act:  Conspiring to Submit or Cause to be Submitted a False Claim or to Make or Use a False Record or Statement**

**(31 U.S.C. § 3729(a)(1)(C))**

163.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 162 of this Complaint as if fully set forth in this claim for relief.

164.    As set forth herein, all Defendants entered into an agreement to defraud the United States.  Defendants reached that agreement in 2017 during the negotiations for the Acquisition.  Defendants agreed that submissions would be made to MARAD in 2017, and then annually thereafter, and that those submissions would falsely certify compliance with the AFA Citizenship Requirement and would omit material information relevant to MARAD's citizenship determinations.  The purpose of their agreement was to obtain MARAD's approval for a foreign conglomerate to fish in U.S. waters using a fleet of vessels Cooke directs and controls. Defendants have reaffirmed their agreements each year since 2017.

165.    Furthermore, every Defendant has taken at least one overt act in furtherance of the conspiracy.  For example, Defendants Cooke, Omega, Glenn Cooke, and Bret Scholtes negotiated the Acquisition and executed the Merger Agreement and the MARAD Sale Agreement.  As another example, Omega created Alpha VesselCo and transferred title to its entire reduction fishing fleet prior to the Acquisition.  As another example, Defendants Cooke Omega Investments and Holdings/Ocean Fleet Services co-issued the Notes and, together with Defendant BMO Capital, confidentially informed prospective investors of the material facts of Cooke and Omega's expected control over Holdings/Ocean Fleet Services, Alpha VesselCo, and the Omega Vessels.  As another example, Defendants Seth and Gregory Dunlop, Holdings/Ocean Fleet Services, and Alpha VesselCo (at the instruction of Defendants Cooke,

Omega, Glenn Cooke, and Scholtes) signed, submitted, and caused the submission of the October Submission and the Citizenship Affidavit, and all of Defendants' subsequent fraudulent submissions to MARAD and the Coast Guard. As another example, Cooke Aquaculture gave permission for its employee Seth Dunlop to serve as the figurehead. As another example, Cooke Seafoods USA allowed Holdings/Ocean Fleet Services and Alpha VesselCo to use the Cooke Seafoods USA Address and building as a front for operations that were actually controlled by Cooke in Canada and by Omega. As another example, Deihl, as an Omega Vice President, agreed to exert actual control over Holdings/Ocean Fleet Services, Alpha VesselCo, and the Omega Vessels, and he has in fact exercised such control.

166. As set forth herein, in connection with the foregoing schemes, Defendants and their co-conspirators knowingly, or with deliberate ignorance or in reckless disregard for the truth, conspired to submit or cause to be submitted a false claim, or conspired to make, use, or cause to be made or used false records and statements material to false and fraudulent claims that were made to the Government, and took actions to further these conspiracies.

167. Defendants are therefore liable to the United States for a civil penalty under the False Claims Act for each of the false or fraudulent claims described herein, plus three (3) times the amount of damages which the Government has sustained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that a judgment be entered against Defendants as follows:

A.       A declaration that Defendants have violated the False Claims Act by falsely certifying compliance with the citizenship requirements of the American Fisheries Act of 1998;

B.       A declaration that Defendants concealed from MARAD and/or the Coast Guard material facts concerning applications for fishery endorsements for the Omega Vessels;

C.       A money judgment for the United States' damages, in an amount to be determined at trial, trebled, plus civil penalties, pursuant to 31 U.S.C. § 3729(a);

D.       An award of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and 31 U.S.C. § 3730(c)(5), including expenses, attorneys' fees, and costs;

E.       All alternate remedies available to the Government, as provided in 31 U.S.C. § 3730(c)(5), including remedies available under 46 U.S.C. § 11213 and 46 U.S.C. § 12151.

F.       All other relief this Court deems just and proper, including pre-judgment and post-judgment interest.

## DEMAND FOR JURY TRIAL

Relators hereby demand a jury trial as to all issues.

Dated: June 25, 2021
     New York, New York

               HOLWELL SHUSTER & GOLDBERG LLP

               By: _____
                  Brendon DeMay (bdemay@hsgllp.com)
                  Margaret B. Hoppin (mhoppin@hsgllp.com)
                  425 Lexington Avenue
                  New York, NY 10017
                  (646) 837-5151

                  *Attorneys for Relators*