**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. W. Benson Chiles and Chris Manthey,<br><br>                            Plaintiffs<br><br>         -v-<br><br>COOKE INC. et al.,<br><br>                            Defendants. | Case No. 1:21-cv-5743 (JMF)<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY BRIEF IN SUPPORT OF MOTIONS TO DISMISS BY DEFENDANTS ALPHA VESSELCO HOLDINGS, INC., ALPHA VESSELCO, LLC, SETH DUNLOP, GREGORY DUNLOP, MONTGOMERY DEIHL, COOKE INC., COOKE AQUACULTURE INC., COOKE OMEGA INVESTMENTS INC., COOKE SEAFOOD USA INC., OMEGA PROTEIN CORPORATION, OMEGA PROTEIN, INC., GLENN COOKE, BRET D. SCHOLTES, AND BMO CAPITAL MARKETS CORP.**

K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Telephone: (202) 778-9370
Facsimile: (202) 778-9100

MCGUIREWOODS LLP
1251 Avenue of the Americas
20th Floor
New York, NY 10020-1104
Telephone: (212) 548-2133
Facsimile: (212) 715-2310

DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Attorneys for Defendants

i

TABLE OF CONTENTS

Page

I. RELATORS' "FISH AS PROPERTY" ARGUMENT FAILS ......................................... 1

    A. The Supreme Court Has Long Held that Fish Are Not Government Property ................................................................................................................ 1

    B. Defendants Never Submitted a "Claim" for Fish ...................................... 4

    C. The Amended Complaint Does Not Allege That Fish Are Government Property ................................................................................................................ 7

II. FISHING LICENSES ARE NOT PROPERTY ................................................................. 7

III. THE ABSENCE OF MATERIALITY REQUIRES DISMISSAL ................................... 8

IV. RELATORS FAIL TO PLEAD WITH THE REQUISITE PARTICULARITY ............ 10

V. RELATORS HAVE NOT STATED A REVERSE FCA CLAIM .................................. 11

CONCLUSION ........................................................................................................................... 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott v. BP Expl. & Prod. Inc.*,
  781 F. Supp. 2d 453 (S.D. Tex. 2011) ................................................................................. 3, 4

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  306 F. Supp. 3d 610 (S.D.N.Y. 2018) (Furman, J.) .................................................................. 7

*Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*,
  190 F.3d 729 (6th Cir. 1999) ................................................................................................. 11

*United States ex rel. Bain v. Georgia Gulf Corp.*,
  386 F.3d 648 (5th Cir. 2004) ................................................................................................. 12

*Baldwin v. Fish & Game Comm'n of Mont.*,
  436 U.S. 371 (1978) ................................................................................................................ 2

*United States ex rel. Billington v. HCL Techs. Ltd.*,
  No. 3:19CV01185(SALM), 2022 WL 2981592 (D. Conn. July 28, 2022) ............................. 6

*United States ex. rel. Campie v. Gilead Scis., Inc.*,
  No. C–11–0941 EMC, 2015 WL 106255 (N.D. Cal. Jan. 7, 2015) ......................................... 6

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
  491 B.R. 335 (S.D.N.Y. 2013) .............................................................................................. 10

*Cleveland v. United States*,
  531 U.S. 12 (2000) .......................................................................................................... *passim*

*Colvin Cattle Co. v. United States*,
  468 F.3d 803 (Fed. Cir. 2006) ................................................................................................. 2

*Douglas v. Seacoast Prod., Inc.*,
  431 U.S. 265 (1977) ................................................................................................................ 2

*Gayle v. Harry's Nurses Registry, Inc.*,
  No. 07-CV-4672 NGG MDG, 2012 WL 4174401 (E.D.N.Y. Sept. 18, 2012) ........................ 7

*Geer v. Connecticut*,
  161 U.S. 519 (1896) ................................................................................................................ 2

*Hughes v. Oklahoma*,
  441 U.S. 322 (1979) ................................................................................................................ 2

*United States ex rel. Kester v. Novartis Pharms. Corp.*,
  2014 WL 2619014 (S.D.N.Y. June 10, 2014) ..........11

*Miller v. United States ex rel. Miller*,
  110 F.4th 533 (2d Cir. 2024) ..........11, 12

*Pasquantino v. U.S.*,
  544 U.S. 349 (2005) ..........8

*United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*,
  No. CV-F-91-194 OWW, 1992 WL 795477 (E.D. Cal. May 4, 1992) ..........11

*United States ex rel. Tessler v. City of New York*,
  712 F. App'x 27 (2d Cir. 2017) ..........1, 11

*United States v. Bengis*,
  631 F.3d 33 (2d Cir. 2011) ..........3

*United States v. Conyers*,
  227 F. Supp. 3d 280 (S.D.N.Y. 2016) ..........12

*United States v. Majestic Blue Fisheries, LLC*,
  196 F. Supp. 3d 436 (D. Del. 2016) .......... *passim*

*United States v. Strock*,
  982 F.3d 51 (2d Cir. 2020) ..........8, 9

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016) ..........3

*Utah Native Plant Soc'y v. United States Forest Serv.*,
  923 F.3d 860 (10th Cir. 2019) ..........2

*Waite v. Schoenbach*,
  2010 WL 4456955 (S.D.N.Y. Oct. 29, 2010) ..........10

*United States ex rel. Yu v. Grifols USA, LLC*,
  No. 1:17-CV-2226-GHW, 2021 WL 5827047 (S.D.N.Y. Dec. 8, 2021) ..........6, 9

*United States ex rel. Yu v. Grifols USA, LLC*,
  No. 22-107, 2022 WL 7785044 (2d Cir. Oct. 14, 2022) ..........9

**Statutes**

16 U.S.C. § 1811 ..........2

18 U.S.C. § 981 ..........3

31 U.S.C. § 3729 ..........5, 6, 12

43 U.S.C. § 1337...........................................................................................................................4

46 U.S.C. § 12151................................................................................................................11, 12

Va. Code Ann. § 28.2-400 ..........................................................................................................6

**Other Authorities**

www.dco.uscg.mil/Portals/9/DCO%20Documents/NVDC/FEE_SCHEDULE_06
    _2023.pdf ..............................................................................................................................4

Senate Commerce Committee, A Legislative History of the Fishery Conservation
    and Management Act of 1976 (Oct. 1976) ........................................................................2, 3

Faced with overwhelming precedent establishing that fishing licenses are not property, Relators attempt to capitalize on their obfuscation and pivot to a *new* argument that appears nowhere in the Amended Complaint ("Complaint"): that the fish themselves are the relevant property. This contention, apart from not being pled, fares even worse than the opening bid, as the Supreme Court has roundly rejected it as "pure fantasy." Relators also fail to establish materiality and instead make facially implausible arguments about the distinction between the words "related" and "nephew." And they effectively abandon any attempt to plead with particularity and simply ask the Court to assume the existence of an "illegal agreement." Finally, their attempt to revive their reverse False Claims Act ("FCA") theory is barred by binding precedent. Defendants, pursuant to the Court's Orders (ECF Nos. 67 and 70), submit this Reply to address these and other arguments warranting dismissal.

I.     **RELATORS' "FISH AS PROPERTY" ARGUMENT FAILS**

   A.     *The Supreme Court Has Long Held that Fish Are Not Government Property*

The federal government does not part with property when private parties harvest fish. Rather, the government has a classic regulatory interest in managing the commercial fishing industry, indistinguishable for all relevant purposes from the interest in regulating the video poker industry described in *Cleveland v. United States*, 531 U.S. 12 (2000). Notwithstanding Relators' meandering historical discourse, the answer to this question has been abundantly clear since 1977, when the Supreme Court decided another case that, much like the present one, involves citizenship issues pertaining to the harvesting of Virginia menhaden. In that virtually identical factual context, the Supreme Court stated:

> A State does not stand in the same position as the owner of a private game preserve and it is ***pure fantasy to talk of "owning" wild fish, birds, or animals***. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture. The "ownership" language of cases such as those cited by appellant must be understood as no more than a ***19th-century legal fiction*** expressing the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. Under ***modern analysis***, the question is simply whether the State has exercised its police power in conformity with the federal laws and Constitution.

1

*Douglas v. Seacoast Prod., Inc.*, 431 U.S. 265, 284–85 (1977) (internal quotation marks and citations omitted) (emphases added).[1]

This was not, as Relators baselessly claim, "a few lines of breezy *dicta*," ECF No. 68 at 10, that the Supreme Court later "walked back" in *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371 (1978). To the contrary, the Supreme Court in *Baldwin* repeated the conclusion that claims to ownership are "no more than a 19th-century legal fiction." 436 U.S. at 386 (quoting *Douglas*, 421 U.S. at 284). And, as Relators acknowledge but tellingly attempt to bury in a footnote, the coup de grâce came the following year, when the Supreme Court in *Hughes v. Oklahoma*, 441 U.S. 322 (1979), overruled *Geer v. Connecticut*, 161 U.S. 519 (1896), and the line of argumentation upon which Relators rely. Relators' bald assertion that *Geer*'s holding that "the state owns wild animals, including fish," survived its overruling, ECF No. 68 at 11 n.2, is impossible to square with the Supreme Court's statement just lines before formally denouncing *Geer*: "In rejecting the argument…[*Douglas*] explicitly embraced the analysis of the *Geer* dissenters[.]" *Hughes*, 441 U.S. at 334. The Supreme Court then went on to quote from and reaffirm the "pure fantasy" language from *Douglas*. *Id.* at 334.[2]

Instead of government property, fish are a proper subject of the government's regulatory power, just like the video poker industry in *Cleveland*. Indeed, as acknowledged in the Magnuson-Stevens Fishery Conservation and Management Act, the federal government has "sovereign rights" over fish within the exclusive economic zone. 16 U.S.C. § 1811. As the Act's legislative history makes clear, this means the right to regulate the fishing industry, not to own the fish themselves. *See, e.g.*, Senate Commerce Committee, A Legislative History of the Fishery Conservation and Management Act of 1976 (Oct. 1976), at 686 ("As no one has property or ownership rights in them, fishery resources are open to anyone…."); *id.* at 1081 (reflecting that

---

[1] Although Relators claim that *Douglas* does not invalidate their interpretation of the Submerged Lands Act, ECF No. 68 at 10–11, that was the very statute that *Douglas* was interpreting, 431 U.S. at 283–84.

[2] Since then, courts have repeatedly cited the "pure fantasy" language in recognition of its continuing vitality. *See, e.g.*, *Utah Native Plant Soc'y v. United States Forest Serv.*, 923 F.3d 860, 871 (10th Cir. 2019); *Colvin Cattle Co. v. United States*, 468 F.3d 803, 808–09 (Fed. Cir. 2006).

there is "no ownership" of fish); *id.* at iii (noting the purpose to create a "comprehensive *management* program for fisheries subject to U.S. jurisdiction") (emphasis added).

Relators attempt to manipulate the timing of the inquiry to avoid the obvious and required result. It is true, but irrelevant, that commercial fisheries reduce fish to possession, thereby converting the "natural resource into private property." ECF No. 68 at 12. The question in the FCA setting is not whether a defendant ever obtains, through downstream commercial activity, anything that can be considered property, but rather whether the government parts with property. Just as it was irrelevant in *Cleveland* that the video poker licensee made money on the machines, as the question was instead whether the government had a property interest in "unissued licenses," 531 U.S. at 18, the right question here is whether fish constitute government property *before* they are caught. Plainly, they do not.

Likewise, it is inconsequential that the government can potentially seek to forfeit illegally captured fish. Virtually all proceeds of unlawful activity can be forfeited under federal law. *See generally* 18 U.S.C. § 981. If the government's property interest for purposes of the FCA were defined as the right to forfeit the proceeds of violations, then virtually every regulatory violation would give rise to an FCA claim. This would run headfirst into the cautionary language that the FCA is not a "vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016).[3]

The only FCA case that Relators cite on the question of natural resources arises in an entirely different context in which the government was engaged in profit-making commercial transactions with private parties who were essentially purchasing oil. *See Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453, 457 (S.D. Tex. 2011). In particular, the defendant received the type of lease for oil and gas exploration that the government makes available to the "highest responsible qualified bidder or bidders by competitive bidding." 43 U.S.C. § 1337. The

---

[3] Although Relators claim that *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011), stands for the proposition that forfeiture springs to life a property interest, that case arose under South African law and does not purport to interpret property interests in fish within the context of the FCA, or even of U.S. law.

3

government retains rights to "royalties or net profit shares, or both," and designates oil and gas as a substitute for currency in the payment of those amounts. *Id.* § 1353(a)(1). In that context, the court held that the FCA covers misrepresentations "that a lessee submits in seeking the right to drill for or develop oil on a federal…lease." *Abbott*, 781 F. Supp. 2d at 462.

By contrast, the federal government treats certificates of documentation with fishery endorsements not as commercial transactions with an expectation to profit from the harvested fish, but rather as standard regulatory licenses. Applicants pay only a nominal fee of $133 for a certificate of documentation, plus $12 for a fishery endorsement.[4] And licensees pay nothing at all for the fish they harvest. The lack of a per-fish charge is fundamentally inconsistent with any notion that the government views itself as parting with property in the form of fish and stands in stark contrast to the lease payments, royalties, and profit shares in *Abbott*.

Relators' position would also vitiate the unbroken line of cases, including *Cleveland* and *United States v. Majestic Blue Fisheries, LLC*, 196 F. Supp. 3d 436 (D. Del. 2016), regarding licenses. Finding that the object of a license to be property would render the rule that licenses themselves are not property meaningless. In *Majestic Blue*, a core allegation was that fraudulent submissions allowed the defendants to "fish for tuna in exclusive zones in the South Pacific…." 196 F. Supp. 3d at 440. Relators make identical arguments about Defendants and menhaden. Without a way to reconcile *Majestic Blue* or any of the related cases, Relators argue for an exception that swallows the rule. The Court should reject the effort to circumvent established precedent.

B.   *Defendants Never Submitted a "Claim" for Fish*

Notwithstanding their attempt to rewrite their Complaint to elide the overwhelming volume of on-point case law, Relators never alleged that Defendants presented a claim to the federal government for fish. Nor could they make such an allegation, as such a claim was not presented and could not logically or lawfully be presented. Central to a valid FCA complaint is

---

[4] The fees are listed on www.dco.uscg.mil/Portals/9/DCO%20Documents/NVDC/FEE_SCHEDULE_06_2023.pdf, which is a government website, and judicial notice can therefore be taken.

4

the requirement that a party present a "claim," which is defined as a "request or demand…for money or property" to the ***federal government*** or its agents. *See* 31 U.S.C. § 3729(a), (b)(2). Even assuming (inaccurately) that fish could be considered property for purposes of the FCA, this mandatory "claim" element is wholly absent.

As the Complaint repeatedly alleges, the only paperwork tendered to the government was for citizenship determinations and, in turn, certificates of documentation with fishery endorsements. *See* Complaint ¶¶ 156, 165, 178 (alleging that the government "would not have determined that the [vessels] are eligible to receive ***fishery endorsements***, and would not have issued ***fishery endorsements***") (emphases added). These filings, of course, are not applications submitted to the government for a particular type or quantity of fish. They are rather regulatory licensures that, subject to further permitting requirements (discussed below), allow the holder to harvest fish. A holder of a certificate may opt not to harvest any fish or to do so only in waters controlled by state governments. Even when licensed parties do fish in federal waters, there is no "claim" presented to the government to obtain the harvested fish, nor is there any payment flowing in either direction in exchange for the fish.

At most, the Complaint argues that Defendants used a license (which is not property) to engage in licensed activities, the result of which was the harvesting of fish. *See id.* ¶¶ 156, 165, 178 (contending that, without the endorsements, "Defendants would not have taken millions of dollars of fish each year from U.S. waters"). Tellingly, Relators cite no case law imposing FCA liability with this degree of attenuation. Nor does any such authority exist.

Moreover, the notion that Defendants made a claim to the Maritime Administration ("MARAD") or the Coast Guard for menhaden—the only species at issue in the Complaint—is legally incoherent. Even assuming, *arguendo*, that menhaden are property, those agencies have no right to part with them. Indeed, Relators never allege that MARAD and the Coast Guard have any authority to unilaterally authorize the harvesting of menhaden. That is because no such authority exists. Even after approval by MARAD and a certificate of documentation with a fishery endorsement from the Coast Guard, ***state licenses*** are required to harvest menhaden. *See*

Va. Code Ann. § 28.2-400; ECF No. 68 at 12 n.3. Even taking as true Relators' false premise that states have an ownership interest in fish, Defendants cannot plausibly be said to have made a claim to the federal government for fish when it is state regulators who authorize their capture.

And even assuming that the federal government had some authority to process claims for fish (which it does not), it is beyond dispute that such imaginary power would exist outside of MARAD and the Coast Guard. Even Relators acknowledge that there are "many other agencies" with relevant jurisdiction, but they do not identify which of them can accept claims for fish and identify no claims submitted to them. ECF No. 68 at 14. Instead, they argue vaguely that "Americans, together, with the government," with the latter acting as a "sovereign," jointly control fish. *Id.* at 13. But courts have consistently held that submissions to licensing agencies, which is all that MARAD and the Coast Guard are serving as here, do not trigger FCA liability when other agencies are tasked with payment. *See, e.g.*, *United States ex. rel. Campie v. Gilead Scis., Inc.*, No. C–11–0941 EMC, 2015 WL 106255, at *9 (N.D. Cal. Jan. 7, 2015) ("No circuit court…has ever interpreted this statutory language as encompassing a false or fraudulent statement to a licensing or regulatory agency—disconnected from the request for payment—simply because that false or fraudulent statement to that licensing agency ultimately enabled the defendant to achieve eligibility for funding from the payor agency."); *United States ex rel. Yu v. Grifols USA, LLC*, No. 1:17-CV-2226-GHW, 2021 WL 5827047, at *11 (S.D.N.Y. Dec. 8, 2021) (applying similar principles). Relators' failure to identify a purported payment agency is therefore fatal.

Relators' reliance on 31 U.S.C. § 3729(b)(2)(A), which provides that a "claim" can be made "whether or not the United States has title to the money or property," is also misplaced. This provision does not do away with the requirement that actual "property" be at issue. *See, e.g.*, *United States ex rel. Billington v. HCL Techs. Ltd.*, No. 3:19CV01185(SALM), 2022 WL 2981592, at *6 (D. Conn. July 28, 2022) ("Plaintiffs mistakenly focus on the issue of title and ignore the core finding of [cases such as *Cleveland* and *Majestic Blue*], which is that a purely regulatory scheme, such as that governing the issuance of visas, does not invoke traditional

6

property rights.") (internal quotation marks, footnote, and alteration omitted). It also does not eliminate the requirement that the federal government be allowed to distribute the property. As a result, the complaint must be dismissed.

  *C.* *The Amended Complaint Does Not Allege That Fish Are Government Property*

  Finally, the Court should not even consider the "fish as property" allegation given that it is made for the first time in Relators' brief. *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 306 F. Supp. 3d 610, 625 (S.D.N.Y. 2018) (Furman, J.) ("[A] party cannot amend its pleadings through a brief[.]") Relators at most alleged that the government issued certificates of documentation with fishery endorsements, enabled by citizenship determinations. *See, e.g.*, Complaint ¶¶ 156, 165, 178. This shift belies the basic concepts of notice pleading and is especially egregious considering this case has been pending for years and Relators had the benefit of the motions to dismiss before filing the Complaint.[5]

## II. <u>FISHING LICENSES ARE NOT PROPERTY</u>

  Relators' alternative argument—that certificates of documentation are property because the Coast Guard lacks discretion over their issuance—suffers from numerous fatal flaws. First, most of Relators' analysis focuses on whether certificates of documentation become property in the hands of their private party holders. But the proper question is whether licenses, including certificates of documentation, constitute property in the hands of the government prior to issuance. Indeed, it would be entirely arbitrary for the FCA to be applicable to some licenses but not others based solely on the government's level of discretion over whether to grant them.

  Additionally, Relators' argument reflects a fundamental misunderstanding of the way that commercial fishing operates. *Majestic Blue* involved two types of authorizations—a certificate of documentation and a South Pacific Tuna Treaty ("SPTT") license—issued under federal law.

---

[5] In a baseless attempt to turn the tables, Relators argue that Defendants waived their right to respond to the "fish as property" argument. Setting aside Relators' failure to even plead this theory, Defendants were not required to anticipate Relators' arguments against dismissal. The basis for Defendants' motions was, and remains, that there is no property at issue. Relators cannot avoid a decision on that point by inventing a property interest that does not exist and then claiming that Defendants did not adequately preempt their fanciful arguments, particularly when Defendants made the fundamental argument that there was no government property alleged. *See, e.g., Gayle v. Harry's Nurses Registry, Inc.,* No. 07-CV-4672 NGG MDG, 2012 WL 4174401, at *1 (E.D.N.Y. Sept. 18, 2012).

196 F. Supp. 3d at 440. A certificate of documentation is a prerequisite to obtaining a species-specific SPTT license. *Id.* The *Majestic Blue* relator alleged that the defendants in that case made false statements in applying for the certificate of documentation. *Id.* at 441. The court's ruling that the SPTT license does not constitute property necessarily means that the certificate of documentation—the only licensure Defendants are alleged to have received—does not either.

Finally, to the extent that Relators attempt to address the question of whether licenses are property in the government's hands, they do so only by conjuring from whole cloth an imaginary rule and then proceeding to misapply it. Specifically, they rely on *Pasquantino v. United States*, 544 U.S. 349 (2005), for the made-up proposition that *Cleveland* somehow only applies to licenses where the "regulatory decision did not protect anything concrete behind it." ECF No. 68 at 15–16. *Pasquantino*, however, did not involve a license at all; rather, it was a case about whether expected tax proceeds constitute property. 544 U.S. at 357. Because the government does not expect any revenue from the issuance of a fishing license other than the nominal application fee (which was indisputably paid) and instead merely decides who can enter a regulated field, this case bears no resemblance to *Pasquantino*. Indeed, years before *Pasquantino* arose, the Supreme Court in *Cleveland* distinguished between claims of fraudulently obtaining liquor licenses and not paying liquor taxes. *See* 531 U.S. at 23. Given that Relators allege only that Defendants improperly obtained a license and not that they failed to make regulatory payments, *Cleveland* squarely applies.[6]

### III. THE ABSENCE OF MATERIALITY REQUIRES DISMISSAL

Relators' affirmative materiality argument rests exclusively on the fraudulent inducement theory from *United States v. Strock*, 982 F.3d 51 (2d Cir. 2020), which has no application to this case. There, the Second Circuit concluded that materiality could be examined from two

---

[6] As described above, the mere possibility that the government can potentially collect fees or undertake forfeitures *in the event of violations* does not mean that an economic interest arises. Otherwise, the Supreme Court in *Cleveland* would have had to rule that the ability to forfeit the proceeds the defendant received was sufficient to transmogrify the license into property. Instead, the Supreme Court held that no property was at issue because the defendant paid "its proper share of revenue" that would be due if the license had been obtained lawfully. 531 U.S. at 22. Likewise, in *Pasquantino*, the objective was to tax lawful liquor sales, and the Supreme Court observed that, "[h]ad petitioners complied with this legal obligation [to pay taxes], they would have paid money to Canada." 544 U.S. at 356.

8

perspectives: the government's choice to "award contracts in the first instance and the decision to ultimately pay claims under these contracts." *See id.* at 60; *see also id.* at 61 (looking at a "misrepresentation's impact on the government's decision to do business with a defendant in the first instance"). Here, there is neither a contract nor a payment decision. Indeed, there is no allegation that any part of the federal government—let alone MARAD or the Coast Guard— "do[es] business" with Defendants. Instead, this case is similar to *Yu*, where the court rejected as incoherent the notion that statements to a non-paying licensing agency were material to the payment agency's decisions. 2021 WL 5827047, at *11 ("The first materiality factor—the failure to disclose a violation that was expressly designated as condition of payment—cannot be readily applied to Relator's theory since, as previously discussed, the FDA did not pay for Gamunex."); *see also United States ex rel. Yu v. Grifols USA, LLC*, No. 22-107, 2022 WL 7785044, at *3 (2d Cir. Oct. 14, 2022) (affirming district court and describing the relator's theory as "attenuated"). Thus, even assuming that there was a payment agency (which there was not), statements made to MARAD and the Coast Guard cannot satisfy the materiality requirement.

Meanwhile, Relators' response to Defendants' materiality briefing falls flat. Rather than admit that they included blatantly false allegations in the original complaint—and continued to include them in the Complaint despite actual knowledge of their falsity—they make the laughable assertion that the distinction between "related" and "nephew" is material to MARAD. *See* ECF No. 68 at 30. Relators proffer this absurd explanation despite the undeniable fact that MARAD responded without inquiring as to the nature of the familial relationship, which actually confirms that Relators' proposed distinction is ***immaterial***. As further evidence that they are attempting to stretch the FCA beyond its breaking point, Relators then suggest that MARAD's views do not matter at all because Relators are in a better position than the regulator, to whose views the Court should not "defer," to assess compliance. *Id.* Moreover, even as they acknowledge that courts look to regulators' historical enforcement record as an indication of materiality, they concede that they have only identified one (factually dissimilar) enforcement action in the relevant statute's two-plus-decade history. *Id.* at 27. Finally, Relators nakedly assert

9

the existence of an undisclosed "illegal agreement" that they contend is definitionally material. *Id.* at 28. But this fails to actually plead materiality, while putting the cart before the horse because the existence of the "illegal agreement" is not adequately pled. Nor can it be truthfully pled, as the undisputed facts, as laid out in the motions to dismiss, demonstrate that Defendants made full and complete disclosures to federal regulators.

## IV.     RELATORS FAIL TO PLEAD WITH THE REQUISITE PARTICULARITY

Relators' allegations do not satisfy basic pleading requirements, let alone Rule 9(b). ***First***, confronted with the disclosures provided to MARAD, Relators ignore the focus of the Complaint, which is the litany of false allegations regarding purported omissions in those disclosures about Seth Dunlop's employment and family history and the relevant details of the transaction, and attempt to recast their Complaint as one centered on a vague "illegal agreement" concerning de facto control. ECF No. 68 at 19.

Putting aside Relators' improper attempt to ignore the gravamen of the allegations and essentially rewrite the Complaint—in which the term "illegal agreement" does not even appear—Relators have provided no details regarding the purported secret agreement, like ***who*** entered into the agreement, ***where*** and ***when*** it was made, ***what*** the precise contents of the agreement were, and ***how*** it was recorded. Instead, Relators ask the Court to infer from appropriate conduct and a single letter that there was an agreement to defraud the government. But the disclosed fact that Seth Dunlop was related to Cooke's CEO does not suggest any "illegal agreement," despite Relators' protestations to the contrary. *Id.* at 21–22. Nor do innocuous allegations that companies shared an attorney or office address (*id.* at 2, 29) or that BMO CMC acted as an underwriter (*id.* at 29), reasonably imply a secret agreement for improper control. *See, e.g.*, *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 350 (S.D.N.Y. 2013) (sharing of "legal and risk management personnel…[was] insufficient to show complete domination and control"); *Waite v. Schoenbach,* 2010 WL 4456955, at *4 (S.D.N.Y. Oct. 29, 2010) ("[A]llegations that Defendants operate at the same location and share employees, officers, owners, and bank accounts, without more, are likewise insufficient to pierce the corporate veil.").

10

To the contrary, the Complaint is replete with examples demonstrating Defendants' meticulousness in adhering to corporate formalities and citizenship requirements. ECF No. 56 at 28–29. Finally, Relators' allegations that isolated statements in a letter sent by Omega to the Commerce Secretary regarding fishing quotas demonstrate the existence of a secret agreement are baseless: that Omega expressed views in its letter regarding fishing quotas that would directly impact its supply of fish reflects nothing more than Omega protecting its supply stream. *See id.* at 19. Relators' bald allegations provide no basis for any inference, let alone the strong inference they are required to establish, that there was an "illegal agreement." *See id.* at 27–30.

**Second**, Relators have not, and cannot, identify a single false claim for payment or property. It is well established that "details included in the complaint must fulfill the purposes of Rule 9(b) by both (1) identifying which of the claims that the defendant submitted were 'false,' and (2) providing a factual basis (as opposed to mere speculation) to support the plaintiff's assertion that claims were actually submitted to a government program." *United States ex rel. Kester v. Novartis Pharms. Corp.,* 2014 WL 2619014, at *5 (S.D.N.Y. June 10, 2014). Relators, though, failed to plead any details regarding who submitted any purportedly false claims for fish or the dates when such claims were submitted. Dismissal is therefore required. *See United States ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29–30 (2d Cir. 2017).

V. **RELATORS HAVE NOT STATED A REVERSE FCA CLAIM**

Although Relators insist that the Second Circuit's decision in *Miller v. United States ex rel. Miller*, 110 F.4th 533 (2d Cir. 2024), is distinguishable, they do not cite a single case that allows a reverse FCA count to be predicated on contingent, attenuated, and unassessed penalties.[7] Instead, Relators rely solely on the words "is liable" in describing a monetary penalty in 46 U.S.C. §§ 12151(a)(1), (c). But *Miller* made clear that not even mandatory-sounding

---

[7] The closest Relators come is *United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*, No. CV-F-91-194 OWW, 1992 WL 795477, at *7 (E.D. Cal. May 4, 1992), but that case involved a scheme specifically designed to evade amounts due, which is a far cry from Relators' (baseless) allegation that Defendants sought to avoid citizenship requirements, one attenuated consequence of which theoretically could be the assessment of discretionary penalties. Additionally, *Sequoia Orange* is an out-of-circuit case that was wrongly decided, *see, e.g.*, *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 739–40 (6th Cir. 1999), and is an outlier compared to recent decisions. Indeed, adherence to Relators' proposed rule would lead to absurd consequences. *See id.* at 739.

language like "shall" suffices where there is an opportunity for the government not to pursue, and a court not to impose, penalties. *See* 110 F.4th at 546 (liability still contingent notwithstanding statute commanding that violators "shall forfeit and pay" penalties).[8]

Relators also ignore that (a)(1) and (c) provide for penalties of "not more than" set amounts, which leaves courts with the discretion to impose no penalty at all. *See, e.g.*, *United States v. Conyers*, 227 F. Supp. 3d 280, 289 (S.D.N.Y. 2016) (concluding, in the context of a statute that provides that defendants "shall be punished" up to a maximum amount without providing a minimum sentence, that the "Court treats the authorization of a maximum penalty as providing discretion to the sentencing judge to sentence anywhere between no penalty and the maximum penalty").[9] This discretion, which is in addition to the government's discretion either not to pursue penalties in the first instance or to affirmatively waive the requirements that give rise to the penalties, makes any liability speculative and contingent, and therefore not subject to a reverse FCA claim. Indeed, in *Majestic Blue*, a ruling whose holdings Relators do not attack, the court expressly concluded that the potential for § 12151 liability cannot give rise to a reverse FCA claim, in part because "liability…is contingent on the government's discretion to impose fines on defendants, as evidenced by the statutory language." 196 F. Supp. 3d at 447.[10]

## CONCLUSION

For the foregoing reasons and those stated in the motions to dismiss, Defendants request that the Court dismiss the Complaint with prejudice.

---

[8] *See also United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004) ("It is clear to us that…the reverse false claims act does *not* extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted) and which do not arise out of an economic relationship between the government and the defendant (such as a lease or a contract or the like)….") (emphasis in original).
[9] By contrast, 46 U.S.C. §§ 12151(a)(2), not at issue here, sets a specific floor for penalties, demonstrating that Congress knows how to create (and eliminate) discretion where that was actually the intended result.
[10] Relators express a desire to amend the complaint again based on *Miller*, which was decided after they filed the Complaint. The Court has already ruled that no further amendments will be allowed in response to the motions to dismiss. *See* ECF No. 43 at 1. Additionally, Relators are wrong to suggest that *Miller* "changed" the law on reverse FCA claims. *See* ECF No. 68 at 18. The Second Circuit was clear that it was merely applying the same rule that courts throughout the country have long used. *See Miller*, 110 F.4th at 545 (joining "our sister circuits"). Additionally, any amendment to bring a claim under 31 U.S.C. § 3729(a)(1)(D) would be futile, as that claim (like the others) would fail due to the lack of property at issue.

Dated: November 12, 2024                                       Respectfully submitted,

*/s/ Robert S. Silverblatt*
Robert S. Silverblatt (admitted *pro hac vice*)
Andrew M. Wright (admitted *pro hac vice*)
K&L Gates LLP
1601 K Street NW
Washington, DC 20006
Telephone: (202) 778-9132
Facsimile: (202) 778-9100
Rob.Silverblatt@klgates.com
Andrew.Wright@klgates.com

*Counsel for Defendants Alpha VesselCo Holdings, Inc., Alpha VesselCo, LLC, Seth Dunlop, Gregory Dunlop, and Montgomery Deihl*

*/s/ David J. Pivnick*
Aaron F. Jaroff
McGuireWoods LLP
1251 Avenue of the Americas
20th Floor
New York, New York 10020-1104
Telephone: (212) 548-2100
ajaroff@mcguirewoods.com

David J. Pivnick (admitted *pro hac vice*)
McGuireWoods LLP
77 W. Wacker Drive, Suite 4100
Chicago, IL 60601
Telephone:  312-750-3585
dpivnick@mcguirewoods.com

Michael J. Podberesky (admitted *pro hac vice*)
McGuireWoods LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 857-1700
mpodberesky@mcguirewoods.com

13

*Attorneys for Cooke Inc., Cooke Aquaculture Inc., Cooke Omega Investments Inc., Cooke Seafood USA, Inc., Omega Protein Corporation, Omega Protein, Inc., Glenn Cooke, and Bret D. Scholtes*

<u>*/s/ Courtney G. Saleski*</u>
Courtney G. Saleski (admitted *pro hac vice*)
Jessica A. Masella
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
courtney.saleski@us.dlapiper.com
jessica.masella@us.dlapiper.com

*Counsel for Defendant BMO Capital Markets Corp.*

14