UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                   :

UNITED STATES OF AMERICA, *ex rel.* et al.,     :
                                   :

               Plaintiffs,       :

                                   :        21-CV-5743 (JMF)

         -v-                     :

                                   :        <u>OPINION AND ORDER</u>

COOKE INC. et al.,                     :

               Defendants.     :

                                   :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In this *qui tam* proceeding, Relators W. Benson Chiles and Chris Manthey ("Relators")
bring claims on behalf of the United States of America under the False Claims Act ("FCA"), 31
U.S.C. §§ 3729-3733, against a Canadian seafood conglomerate called Cooke Inc. ("Cooke")
and its subsidiaries, affiliates, officers, and employees (together, "Defendants"). *See* ECF No. 48
("Compl."), ¶¶ 1, 15-26. Relators allege that Defendants defrauded the Government by
submitting false statements and omitting material information in order to obtain commercial
fishing vessel licenses and harvest fish in U.S. waters. Defendants now move, pursuant to Rules
9(b) and 12(b) of the Federal Rules of Civil Procedure, to dismiss the operative Amended
Complaint in its entirety. *See* ECF Nos. 51, 55, 59. They argue, among other things, that
Relators' primary claims fail because neither fishing licenses nor fish qualify as "property"
within the meaning of the FCA. The Court agrees. Accordingly, and for the reasons that follow,
Defendants' motions are granted, and the Amended Complaint is dismissed.

## BACKGROUND[1]

Under the American Fisheries Act of 1998 ("AFA"), a vessel is permitted to engage in commercial fishing in U.S. waters if it has a valid fishery endorsement — that is, a fishing license.  46 U.S.C. § 12113(b)(1).  Of particular relevance to this case, the AFA provides that "[a] vessel owned by an entity is eligible for a fishery endorsement *only* if at least 75 percent of the interest in the entity . . . is owned and controlled by citizens of the United States."  *Id.* § 12113(c)(1) (emphasis added).  The AFA assigns responsibility for fishery endorsement eligibility determinations to the Maritime Administration ("MARAD") — an agency of the U.S. Department of Transportation — and to the Coast Guard.  S*ee* 46 C.F.R. § 356.5; 46 U.S.C. §§ 12105(3)(a), 12113(e)(1); 49 U.S.C. § 109(a).  Noncompliance with the AFA's citizenship requirement can result in revocation of a fishery endorsement and the imposition of civil penalties.  *See* 46 U.S.C. § 12113(h); *id.* § 12151(a).

Cooke is a Canadian seafood conglomerate that, with its subsidiaries Omega Protein Corporation and Omega Protein, Inc. (together, "Omega"), harvests and processes menhaden, a commercially valuable fish.  Compl. ¶¶ 3-5.  Until December 2017, Omega was an independent, publicly traded U.S. company that owned a fleet of fishing vessels that harvested menhaden from U.S. waters in the Atlantic Ocean and the Gulf of Mexico.  *Id.* ¶ 4.  That month, however, Cooke acquired Omega and its subsidiaries and assets — including its fishing vessels — and Omega became a foreign entity for purposes of the AFA.  *Id.* ¶ 5.  Relators allege that Defendants, upon realizing that the acquisition would render Omega's fishing vessels ineligible to fish in U.S.

---

[1]     The facts set forth in this section, taken from the Amended Complaint unless otherwise noted, are assumed to be true.  *See, e.g.*, *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011).

waters, concocted "a figurehead scheme to violate the AFA Citizenship Requirement, conceal the violation, and defraud the United States." *Id.* ¶ 6.

Specifically, Relators allege that Cooke "restructured the entire Acquisition to create an illusion of compliance with the AFA Citizenship Requirement" by "transferr[ing] the Omega Vessels to a new subsidiary and then [selling] that subsidiary to a new Delaware shell entity which is 20% owned by Omega and 80% owned by a U.S. citizen named Seth Dunlop." *Id.* ¶ 7. According to Relators, however, Dunlop was "just a figurehead" because, in reality, "Cooke and Omega retained control" over the fishing vessels. *Id.* Relators allege that Defendants, having restructured the acquisition in this manner, "caused the submission, and/or conspired to submit, false and fraudulent fishery endorsement applications to MARAD and the Coast Guard, on an annual basis, for every Omega Vessel." *Id.* ¶ 8. Each application contained a sworn citizenship affidavit and supporting submissions that "expressly and falsely represent[ed] that there is no 'understanding' by which a non-citizen controls the nominal owner of the Omega Vessels" and "omit[ted] material information that undermines that false representation." *Id.* (emphasis omitted). Relators allege that Defendants submitted these applications despite each Defendant's "understanding that Cooke and Omega would continue to control the Omega Vessels and the Delaware shell, and would operate them for their own financial benefit." *Id.* ¶ 9.

Relators allege that "[i]f Defendants had not falsely represented to the Government . . . that the Delaware shell and Omega Vessels would be in fact controlled by the figurehead" — or "if Defendants had disclosed the material facts regarding the understandings and arrangements through which Cooke and Omega exercise actual control over the figurehead" — "MARAD would have determined that the Omega Vessels could not operate in the United States commercial fisheries, and Defendants would not have harvested millions of dollars' worth of

fish." *Id.* ¶ 11.  More specifically, in their operative Amended Complaint, Relators bring four

causes of action under the FCA: (1) that Defendants knowingly presented or caused to be

presented a false or fraudulent claim, *see* 31 U.S.C. § 3729(a)(1)(A); Compl. ¶¶ 151-59; (2) that

Defendants knowingly made or caused to be made a false statement material to a false claim, *see*

31 U.S.C. § 3729(a)(1)(B); Compl. ¶¶ 160-67; (3) that Defendants conspired to present a false

claim, *see* 31 U.S.C. § 3729(a)(1)(C); Compl. ¶¶ 168-72; and (4) that Defendants knowingly

made a false statement to avoid an obligation to pay the United States in violation of the FCA's

"reverse false claim" provision, *see* 31 U.S.C. § 3729(a)(1)(G); Compl. ¶¶ 173-81.

## LEGAL STANDARDS

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept[]

all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's

favor."  *ATSI Commc'ns, Inc. v. Schaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Court

will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff fails to plead sufficient

facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007), that is, one that contains "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, a plaintiff must allege facts showing "more

than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that offers only

"labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not

do." *Twombly*, 550 U.S. at 555.  Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

## DISCUSSION

Defendants seek dismissal of all four causes of action.  The Court can and will address the first three together and then turn to Relators' reverse false claims cause of action.

## A.  Submission of False Claims and Conspiracy To Do the Same

Sections 3729(a)(1)(A) and (a)(1)(B) of the FCA impose liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to an officer or employee of the United States, or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." To prevail under either section, a relator must allege that the "defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd on other grounds*, 563 U.S. 401 (2011); *see also United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 405 F. Supp. 3d 549, 555 (S.D.N.Y. 2019) (noting that courts "generally treat" Sections 3729(a)(1)(A) and (a)(1)(B) "together, as their elements overlap significantly").  To prevail on a claim of conspiracy to violate the FCA, at least where (as here) the claim is based on the same allegations as the underlying substantive claims, a relator must allege "an underlying wrongful act." *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 336 (S.D.N.Y. 2004); *accord United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, 551 F. Supp. 3d 27, 48 (E.D.N.Y. 2021), *aff'd*, 2022 WL 17818587 (2d Cir. 2022).

Significantly, the FCA is not "designed to reach every kind of fraud practiced on the Government." *United States v. McNinch*, 356 U.S. 595, 599 (1958). Indeed, the Supreme Court has cautioned that "[t]he False Claims Act is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)) (citation omitted). Most notably for present purposes, the FCA is limited to fraud in connection with a "claim," which is defined, in relevant part, as a "request or demand . . . for money or property" that is "presented to an officer, employee, or agent of the United States," "whether or not the United States has title to the money or property." 31 U.S.C. § 3729(b)(2)(A); *see McNinch*, 356 U.S. at 599 (observing that "the conception of a claim against the government normally connotes a demand for money or for some transfer of public property" (internal quotation marks omitted)). Thus, Relators' first three causes of action — for violation of Sections 3729(a)(1)(A) and (a)(1)(B) of the FCA and conspiracy to do the same — all require a showing that Defendants made a request for "money or property" within the meaning of the statute. Relators do not contend that Defendants made any request for money. Instead, they assert that Defendants submitted false claims for two forms of "property": first, the fishery endorsements Defendants obtained for their fishing vessels; and, second, the menhaden fish that Defendants were able to harvest from U.S. waters as a result of having obtained those endorsements. ECF No. 68 ("Rels.' Opp'n"), at 3-16. Both theories, however, are foreclosed by binding precedent.

**1.  The Fishery Endorsements Are Not Property**

The Court begins with Relators' contention that the fishery endorsements qualify as property. The FCA itself does not define the term "property." Instead, to determine whether

something qualifies as "property" within the meaning of the statute, courts often look for guidance — as the parties here do as well, *see* ECF No. 52 ("Cooke Defs.' Mem."), 7-8; ECF No. 56 ("Alpha Defs.' Mem."), at 9-12; ECF No. 60 ("BMO Capital Markets Mem."), at 16; Rels.' Opp'n 3-4 — to cases interpreting the federal mail fraud statute, which, like the FCA, prohibits obtaining "money or property" through fraud.  *See, e.g.*, *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 727 (D.C. Cir. 2019); *United States ex rel. Billington v. HCL Techns. Ltd.*, No. 3:19-CV-1185 (SALM), 2022 WL 2981592, at *5-6 (D. Conn. July 28, 2022) (Merriam, J.); *Franchitti v. Cognizant Tech. Solutions Corp.*, 555 F. Supp. 3d 63, 69 (D.N.J. 2021).  The Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), upon which both sides here rely, *see, e.g.*, Cooke Defs.' Mem.. 7-8; Alpha Defs.' Mem. 9-10; BMO Capital Markets Mem. 16; Rels.' Opp'n 4, looms especially large.

The defendant in *Cleveland* was charged under the mail fraud statute with fraudulently obtaining a license to operate video poker machines in Louisiana and moved to dismiss the charges on the ground that the alleged fraud did not deprive the State of "property."  531 U.S. at 15-17.  The Court agreed and held that "a government regulator" does not "part[] with 'property' when it issues a license."  *Id.* at 20.  In reaching that determination, the Court drew a distinction between property interests and regulatory interests, concluding that "whatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is *regulatory*," not proprietary.  *Id.*  The Court described the State's "legitimate interest in providing strict regulation . . . related to the operation of establishments licensed to offer video draw poker devices," observing further that Louisiana's statute defines civil and criminal penalties for unauthorized use of video poker devices in violation of the licensing rules.  *Id.* at 20-21 (cleaned up).  All of this, the Court explained, amounted to "a typical regulatory program"

because "[i]t licenses, subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization." *Id.* at 21.

The Court held that Louisiana did not possess a property interest in poker licenses merely because "the State receives a substantial sum of money in exchange for each license." *Id.* "Licenses pre-issuance," the Court observed, "do not generate an ongoing stream of revenue." *Id.* "At most, they entitle the State to collect a processing fee from applicants for new licenses. Were an entitlement of this order sufficient to establish a state property right, one could scarcely avoid the conclusion that States have property rights in any license or permit requiring an upfront fee, *including* drivers' licenses, medical licenses, and *fishing* and hunting *licenses*." *Id.* (emphases added). "Such licenses," however, "are purely regulatory." *Id.* The Court also rejected the contention that Louisiana had a property interest because it had "significant control over the issuance, renewal, suspension, and revocation of licenses." *Id.* at 22 (internal quotation marks omitted). "[F]ar from composing an interest that has long been recognized as property," the Court reasoned, "these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate." *Id.* at 23 (cleaned up). "Even when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on liquor. Such regulations are paradigmatic exercises of the States' traditional police power." *Id.*

Notably, relying in part on *Cleveland*, another district court has held — on facts similar to those alleged here — that fishing licenses do not qualify as "property" within the meaning of the FCA. *See United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 196 F. Supp. 3d 436 (D. Del. 2016). The court there explained that "[a]pproval for a [fishing] license requires a party to meet certain conditions in order to engage 'in pursuits that private actors may

not undertake without official authorization,' and subjects license holders to official inspections." *Id.* at 444 (quoting *Cleveland*, 531 U.S. at 21). The *Majestic Blue Fisheries* court found additional support for its conclusion in Federal Circuit decisions holding that fishing licenses do not "constitute a traditional property right" because "applicants lack[] the authority to exclude others from the fishery," and "the right to exclude" is a hallmark of property interests. *Id.* (cleaned up); *see also Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1374 (Fed. Cir. 2004) (concluding, in the Fifth Amendment takings context, that the plaintiff lacked "a property interest in its fishing permits and authorization letter" for its fishing vessels); *Conti v. United* States, 291 F.3d 1334, 1341 (Fed. Cir. 2002) (holding that a swordfishing permit did not confer a property interest for purposes of the Takings Clause). "Because a [fishing] license is not property," the *Majestic Blue Fisheries* court concluded, "there is no 'plausible claim for relief' under the FCA." *Majestic Blue Fisheries*, 196 F. Supp. 3d at 445.

The Court reaches the same conclusion here. Indeed, to summarize the Supreme Court's decision in *Cleveland* — which, as noted, explicitly included fishing licenses as an example of licenses for which the state has a "purely regulatory" interest — is effectively to reject Relators' contention that fishery endorsements qualify as "property." 531 U.S. at 22. Like the statute at issue in *Cleveland*, "the [AFA] establishes a typical regulatory program": "It licenses, subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization." *Id.* at 21. Or, as Defendants put it, "the federal government treats certificates of documentation with fishery endorsements not as commercial transactions with an expectation to profit from the harvested fish, but rather as standard regulatory licenses." ECF No. 71 ("Defs.' Reply"), at 4. For example, "[a]pplicants pay only a nominal fee of $133 for a certificate of documentation, plus $12 for a fishery endorsement," and "licensees pay nothing at all for the fish

they harvest." *Id.*; *see also* Cooke Defs.' Mem. 8 ("[T]he Government does not conduct the fishing itself, does not hold permits for that prerogative, and is not selling fishing permits in the ordinary commercial sense.").  A straightforward application of *Cleveland* thus forecloses Relators' licensing theory of property here.  *See also United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1205 (10th Cir. 2006) (rejecting an FCA relator's effort to locate a government property right in export certificates because "applying the statute in this fashion would stretch it far beyond its intended purpose").

Relators' two counterarguments are unpersuasive.  First, citing out-of-circuit cases that predated *Cleveland*, Relators argue that "[c]ases assessing whether licenses are property distinguish between licenses that are mandatory . . . and licenses that are discretionary."  Rels.' Opp'n 15.  But *Cleveland* drew no such distinction, and Relators do not explain why the government would possess a property interest in "mandatory" licenses that have not yet issued.  Second, Relators contend that *Pasquantino v. United States*, 544 U.S. 349 (2005) — and not *Cleveland* — governs this case.  In *Pasquantino*, the Supreme Court held that Canada possessed a "property" right to uncollected excise taxes on liquor that was illegally imported into the country.  544 U.S. at 355.  The uncollected tax, the Court reasoned, was a right to "collect money" which is a "valuable entitlement[]" considered to be "'property' as that term ordinarily is employed."  *Id.* at 355-56 (citing Black Law's Dictionary 1382 (4th ed. 1951) (defining "property" as "extend[ing] to every species of valuable right and interest")); *see also id.* at 356 ("The right to be paid money has long been thought to be a species of property.").  The Court distinguished *Cleveland* on that basis, explaining that whereas the "State's interest in an unissued video poker license was not 'property,' because the interest in choosing particular licensees was 'purely regulatory' and 'could not be economic,'" Canada's "entitlement to tax revenue is a

straightforward 'economic' interest." *Id.* at 356-57 (alterations omitted). But the *Cleveland* Court expressly rejected the State's argument that it possessed a property interest in licenses because it received "a substantial sum of money in exchange for each license," 531 U.S. at 21, and nothing in *Pasquantino* altered that straightforward principle. Here, "[b]ecause the government does not expect any revenue from the issuance of a fishing license other than the nominal application fee (which was indisputably paid) and instead merely decides who can enter a regulated field," Defs.' Reply 8, *Pasquantino* is inapposite. Instead, *Cleveland* controls and compels the conclusion that the fishing licenses Defendants allegedly obtained through their false certifications were not property.

### 2. The Fish Are Not Property

Relators' alternative theory — that the wild menhaden fish harvested in U.S. waters by Defendants are themselves "property" within the meaning of the FCA, *see* Rels.' Opp'n 3-14 — is also foreclosed by Supreme Court precedent.[2] Relators' argument on that score rests primarily on the Supreme Court's 1896 decision in *Geer v. Connecticut*, 161 U.S. 519 (1896), which recognized that the sovereign possesses a "property" interest in wildlife "as a trust for the benefit

---

[2]     Relators assert that Defendants forfeited any response to their fish-as-property theory because the issue was mentioned only in passing in a footnote. *See* Rels.' Opp'n 9-10; *see also* Cooke Mem. 8 n.3 (arguing that "there is no property interest in wildlife or fish, such as menhaden in the Atlantic Ocean"). But Relators are arguably the ones who raised the issue belatedly, as their Amended Complaint does not make pellucid their theory that the "property" at issue was the fish that Defendants harvested. In any event, even if Defendants could have and should have raised the issue more squarely in their initial memoranda of law, the Court has discretion to consider it. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005). Exercising that discretion is especially appropriate where, as here, the issue is purely one of law. Moreover, Relators "cannot claim that [they were] blindsided . . . or that [they were] prejudiced by the district court's consideration of that issue," as reflected in the fact that they thoroughly briefed the issue in their opposition memorandum of law. *Id.* That is not surprising, as Defendants' "motion was cast in terms of the broader and subsuming argument" that Relators had failed to allege any money or property underlying their FCA claims. *Id.*

of the people, and not as a prerogative for the advantage of the government." *Id.* at 529; *see* Rels.' Opp'n 6. But Relators' reliance on *Geer* is misplaced because *Geer* was overruled by the Supreme Court's subsequent decisions in *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265 (1977), and *Hughes v. Oklahoma*, 441 U.S. 322 (1979), both of which repudiated the notion that wildlife such as fish qualify as property. In *Douglas*, the Supreme Court held unlawful a Virginia law prohibiting vessels owned by nonresidents from fishing in state waters. In reaching that holding, the Court rejected the argument that "because the States 'own' the fish, they can exclude federal licensees." 431 U.S. at 283. Quoting from Justice Field's dissent in *Geer*, the Court explained that "[a] State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture." *Id.* (quoting *Geer*, 161 U.S. at 539-40 (Field, J., dissenting)). And it described "the 'ownership' language" in prior cases as "no more than a 19th-century legal fiction expressing the importance to its people that a State have power to preserve and *regulate* the exploitation of an important resource." *Id.* (internal quotation marks omitted and emphasis added).[3] Two years later, in *Hughes*, the Court confirmed *Geer*'s demise, explaining that, "[i]n rejecting the argument that Virginia's 'ownership' of fish swimming in its territorial waters empowered the State to forbid fishing by federally licensed ships owned by nonresidents while permitting residents to fish, [*Douglas*] explicitly embraced the analysis of the

---

[3]      The Supreme Court previewed the point even earlier, when it observed that "[t]he whole ownership theory . . . is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and *regulate* the exploitation of an important resource." *Toomer v. Witsell*, 334 U.S. 385, 402 (1948) (emphasis added).

*Geer* dissenters." 441 U.S. at 334. Lest there be any doubt, the *Hughes* Court announced that its decision "expressly overrule[d] *Geer*." *Id.* at 335.

Relators attempt to dismiss the relevant language in *Douglas* as "colorful" and "breezy *dicta*," Rels.' Opp'n 10-11, claiming that the Supreme Court "walked back" its language a year later in *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371 (1978). But they are wrong. For one thing, *Baldwin* pre-dated *Hughes*, which, as noted, expressly overruled *Geer*. *See Hughes*, 441 U.S. at 335. For another, *Baldwin* itself explained that, following *Douglas*, *Geer*'s logic had "remaining vitality" only insofar as the antiquated concept of "ownership" was shorthand for a state's "power to preserve and regulate the exploitation of an important resource." *Baldwin*, 436 U.S. at 386. In other words, *Geer* survives only to the extent that its account of the state's control over wildlife reflects the state's regulatory, as opposed to property, interest. If anything, then, *Baldwin* cuts against Relators' argument. Finally, and in any event, the Court is equally bound by the Second Circuit's explicit adoption of *Douglas* in *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978), in which the Circuit opined that "[a]s a general rule, wild fish, birds and animals are owned by *no one*. Property rights in them are obtained by reducing them to possession," *id.* (emphasis added). Other circuit courts have expressly adopted and applied *Douglas*'s binding reasoning as well. *See, e.g.*, *Utah Native Plant Soc'y v. United States Forest Serv.*, 923 F.3d 860, 871 (10th Cir. 2019) (wild mountain goats); *Colvin Cattle Co. v. United States*, 468 F.3d 803, 808-09 (Fed. Cir. 2006) (wild horses).

Unable to marshal binding precedent, Relators cite a law review article to argue that "the state sovereign ownership of wildlife articulated in *Geer* is still alive and well," pointing to state and federal legislation that refers to state "ownership" of wildlife. Rels.' Opp'n 4-6 (citing Michael C. Blumm & Lucus Ritchie, *The Pioneer Spirit and the Public Trust: The American*

*Rule of Capture and State Ownership of Wildlife*, 35 Env't L. 673 (2005)).  In doing so, however, Relators ignore *Douglas* and *Hughes*.  *Douglas* and its progeny make clear that talk of owning wildlife is not to be taken literally — that such ownership language is a "pure fantasy" and merely a reflection of a state's regulatory authority over natural resources.  *Douglas*, 431 U.S. at 283-84.  The Second Circuit's decision in *Long Cove* is to the same effect.  The defendants in *Long Cove* were charged with violating the National Stolen Property Act by taking undersized clams from the Long Island Sound and selling them to area restaurants.  *See Long Cove*, 582 F.2d at 161-62.  The government argued that the clams were "stolen" from the State of New York because of a New York law that provided that "[t]he State of New York owns all fish, game, wildlife, shellfish, crustacea and protected insects in the state, except those legally acquired and held in private ownership."  *Id.* at 164.  Considering "whether New York has asserted a true ownership interest in wildlife," the Second Circuit concluded that it had not.  *Id.* at 165; *see also United States v. Schultz*, 333 F.3d 393, 405 (2d Cir. 2003) (observing that "the purpose of asserting ownership" over wildlife is "only to regulate and control the use and disposition of [it], not to actually take possession of it").  New York is not, for example, liable for an attack by any wild animal, as an actual private owner of such an animal would be.  *See Long Cove*, 582 F.2d at 164.  In other words, the fact that a state claims ownership over wildlife does not mean that the state has a genuine property interest in wildlife.

Trying a different tack, Relators argue that, even assuming "that fish are not property in the water," that premise "does not foreclose FCA liability" because fish "transform into private property once they are caught."  Rels.' Opp'n 12.  The point is well taken: Menhaden fish that are lawfully harvested by commercial fisheries do indeed become private property.  But the point is also immaterial.  The FCA "protect[s] the funds and property of the Government from

14

fraudulent claims," *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968), including property over which the government holds title *and* property administered by the government on behalf of another person.  In other words, the question is not whether a defendant ever obtains, through downstream commercial activity, something that can be considered property — as was the case for the video poker licensee in *Cleveland* after obtaining the licenses.  Instead, the relevant question here is whether the menhaden fish at issue constituted the *government's* property *before* Defendants harvested them.  For the reasons discussed above, they did not.

For similar reasons, *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011), a criminal restitution case cited in passing by Relators, *see* Rels.' Opp'n 18, is of no moment.  Admittedly, *Bengis* held that South Africa had "a property interest in rock lobsters unlawfully harvested from its waters."  631 F.3d at 35.  But that property interest attached "the moment a fisherman pull[ed] an illegally harvested lobster out of the sea."  *Id.* at 39.  Virtually all fruits of unlawful activity can be forfeited under federal law.  *See, e.g.*, 18 U.S.C. § 981.  That cannot be sufficient to create a property interest for purposes of the FCA, as it would mean that virtually every regulatory violation would give rise to an FCA claim, despite the Supreme Court's admonition that the statute is not a "vehicle for punishing garden-variety . . . regulatory violations."  *United Health Servs.*, 579 U.S. at 194.  As if to underscore the point, the *Bengis* court stressed that the harvesting of rock lobsters lawfully was "a regulatory scheme."  631 F.3d at 39.  Finally, and in any event, the court in *Bengis* was construing South African, not American, law.  *See id.*

Finally, Relators contend that "[e]ven if no specific American holds 'title' to [fish in U.S. waters], they are owned in common by all Americans, together with the government administering and managing public fish stocks as a steward to 'preserve' this economically valuable and ecologically important natural resource."  Rels.' Opp'n 13.  It is true that, under the

FCA, a false claim is actionable "whether or not the United States has title to the money or property," 31 U.S.C. § 3729(b)(2)(A), so long as the government "provides or has provided any portion of the money or property requested or demanded," *id.* § 3729(b)(2)(A)(ii)(I); *United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 602 (2d Cir. 2019). But the problem with Relators' contention is not merely that the government lacks a property interest in wild fish before they are caught — it is that "no one" does. *Long Cove Seafood, Inc.*, 582 F.2d at 163. What is more, Relators' argument about the government's administration of fish stocks only underscores the purely regulatory interest at play. Relators describe how "the government plays . . . an administrator role" by "monitoring and investing heavily in fish in U.S. waters; by using the AFA's citizenship rule to bolster the U.S. maritime industry; . . . and by investing substantial resources in managing, preserving, protecting, and maintaining fish in U.S. waters" — all of which are hallmarks of the government's regulatory interest. Rels.' Opp'n 14 (cleaned up); *see also id.* at 7 (noting that the government "has the right to acquire possession of fish in U.S. waters, has the right to exclude others from taking fish, and similar rights"). In other words, Relators insist that "because fish in U.S. waters are *managed* by the government . . . that is enough." *Id.* at 14. It is not. The Second Circuit has advised that "[a] law prohibiting a particular use of a commodity that the government does not use or possess ordinarily does not create a property right. If it did, many government regulations would create property rights." *United States v. Evans*, 844 F.2d 36, 42 (2d Cir. 1988). And, as the Supreme Court has cautioned, the FCA is not a "vehicle for punishing garden-variety . . . regulatory violations." *Universal Health Servs.*, 579 U.S. at 194. "Absent ample evidence of congressional intent," which the Relators have not provided, the Court "will not interpret the term property in a way

that fundamentally changes the relationship between the FCA and garden-variety regulatory violations." *Kasowitz*, 929 F.3d at 728.

*          *          *          *

For these reasons, the Court concludes that neither the fishery endorsements Defendants obtained for their fishing vessels nor the menhaden fish Defendants were able to harvest from U.S. waters are "property" within the meaning of the FCA.  Accordingly, Relators' first three causes of action — for submissions of false claims in violation of Sections 3729(a)(1)(A) and 3729(a)(1)(B) of the FCA and conspiracy to do the same — must be and are dismissed.[4]

## B.  Reverse False Claims

That leaves only Relators' cause of action under the FCA's reverse false claim provision, *see* Compl. ¶¶ 173-81, which "covers claims of money *owed* to the government, rather than payments *made* by the government," *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021).  Specifically, the provision imposes civil liability on any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G).  The FCA defines an "obligation" as "an established duty, whether or not fixed, arising from" enumerated sources, including a contractual relationship, a statute, or a regulation.  31 U.S.C. § 3729(b)(3).  "Accordingly, the existence of a cognizable 'obligation' turns on whether a duty is 'established' — or whether there is *any* duty to pay." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 543 (2d Cir. 2024) (internal quotation marks omitted).  "[A]

---

[4]    The Court need not and does not reach Defendants' alternate grounds for dismissal of these causes of action.  Accordingly, there is no need for the Court to consider Relators' sur-reply.  *See* ECF No. 77.

duty to pay is 'established' only when it triggers an immediate and self-executing duty to pay."
*Id.* at 545. "In contrast, a duty to pay is not established — and there is no cognizable 'obligation'
under the reverse false claim provision — when the imposition of penalties depends on
government discretion." *Id.* Thus, for example, "a duty is *not* established" when "a statute gives
an agency the ability to decide whether to impose a civil penalty for a violation of the law." *Id.*
at 544. Put simply, "[t]here is no obligation to pay unless and until the government has
determined that a fine *must* be paid." *Id.* at 545-46 (emphasis added).

       These principles, and the Second Circuit's decision in *Miller*, doom Relators' reverse
false claims cause of action. Citing the AFA's language that anyone who violates the statute "is
liable" for a civil penalty, Relators contend that Defendants had an obligation to pay the
government money because their violations of the citizenship requirement triggered "mandatory"
penalties. Rels.' Opp'n 17 (quoting 46 U.S.C. §§ 12151(a)(1), (c)). But a nearly identical
argument was made and rejected just months ago in *Miller*. In fact, if anything, *Miller* involved
a statute with even more mandatory language than the AFA, namely a statute providing in
relevant part that an entity "*shall forfeit and pay*" a civil penalty for violations. 12 U.S.C.
§ 1818(i)(2)(A) (emphasis added). The court acknowledged that this language, "by itself, could
arguably be read to require immediate and mandatory penalties." *Miller*, 110 F.4th at 546. Even
so, the court concluded that it was not enough to create an "established duty" to pay, and thus an
"obligation," because "the statutory context makes clear that these penalties are not mandatory,
but discretionary." *Id.* The statute's "repeated use of the term 'may'" to describe the agency's
enforcement authority, the court reasoned, "implies discretion, and undercuts [the relator's]
claim that the 'shall forfeit and pay' imposes mandatory penalties." *Id.* at 547 (citation omitted).

The statutory penalties at issue here are similarly discretionary.  For starters, the AFA's language is not even as stark as the language that gave the *Miller* court some initial pause, as it provides only that "a person that violates this chapter or a regulation prescribed under this chapter *is liable* to the United States Government for a civil penalty."  46 U.S.C. § 12151(a)(1) (emphasis added); *see also United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1040-41 (5th Cir. 2016) (holding that "shall be liable to the United States for a civil penalty" language does not give rise to an established duty to pay under the FCA where the agency retains discretionary authority not to impose a penalty).  For another, the AFA's penalty provision establishes only a ceiling "of not more than $15,000" for penalties.  *Cf., e.g.*, *United States v. Conyers*, 227 F. Supp. 3d 280, 289 (S.D.N.Y. 2016) (concluding, in the context of a statute that provides that defendants "shall be punished" up to a maximum amount without providing a minimum sentence, that the "Court treats the authorization of a maximum penalty as providing discretion to the sentencing judge to sentence anywhere between no penalty and the maximum penalty").  By contrast, 46 U.S.C. § 12151(a)(2), which is not at issue here, provides a floor for penalties, demonstrating that Congress knows how to create — or eliminate, as the case may be — discretion to impose statutory penalties when it wishes to do so.

What is more, regulations promulgated by MARAD under the AFA make plain that the statutory penalties at issue here are discretionary.  They provide that if a vessel owner submits false statements to obtain a vessel's fishery endorsement, "penalties *may* apply"; "[t]he vessel's fishery endorsement *may* be revoked"; "[a] fine . . . *may* be assessed against the vessel owner"; and "[t]he owner . . . *may* be subject to additional fines."  46 C.F.R. § 356.49 (emphases added). As in *Miller*, this "repeated use of the term 'may' implies discretion" on the agency's part.  110 F.4th at 547.  The regulations further provide that if MARAD "ha[s] a concern regarding a Non-

Citizen" controlling a fishing vessel, "[it] will notify the entity of the concern and work with the entity toward a satisfactory resolution, provided there is no verifiable evidence of fraud," 46 C.F.R. § 356.11(d), further undercutting Relators' claim that the "is liable" language in the statute imposes self-executing and immediate monetary penalties.  And while it is true that "a regulation can[not] override [a] statute," Rels.' Opp'n 17; *see, e.g.*, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), the language of these regulations is no more inconsistent with the "is liable" language of the AFA than prosecutorial discretion is with the mandatory language found throughout Title 18 of the United States Code, *see, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (holding that a statute "commit[ted]" to an agency "complete discretion . . . to decide how and when" to bring criminal charges even though it provided that violators "shall be imprisoned . . . or fined" and observing that such language "is commonly found in the criminal provisions of Title 18 of the United States Code").

If all this were not enough, Relators' own Amended Complaint confirms the discretionary nature of the applicable penalties under the AFA.  In describing the statutory scheme, Relators note that "[t]he National Vessel Documentation Center ('NVDC') . . . is one of the federal bodies that investigates vessel citizenship requirement violations and *recommends* appropriate penalties."  Compl. ¶ 53 (emphasis added).  To illustrate the penalty regime in practice, the Amended Complaint then recounts a January 2011 case in which the NVDC and MARAD launched a joint investigation of Trico Marine Services, Inc. ("Trico") and concluded that "Trico had violated the citizenship requirement."  *Id.*  Over a year later, "the Coast Guard approved commencement of a civil penalty assessment process against Trico to collect penalties under 46 U.S.C. § 12151(a)" — a determination with which "MARAD concurred."  *Id.*  On Relators' own account, then, the applicable civil penalty regime is far from immediate or self-

executing but rather laden with discretion.  As another district court put it in reaching the same

conclusion: "[L]iability under [Section 12151 of the AFA] is contingent on the government's

discretion to impose fines on defendants, as evidenced by the statutory language.  As such, these

potential obligations to pay unassessed fines are not within the scope of the FCA."  *Majestic*

*Blue Fisheries*, 196 F. Supp. 3d at 447.

Accordingly, Relators' fourth cause of action must be and is dismissed as well.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss must be and are GRANTED,

and Relators' Amended Complaint is dismissed in its entirety.

The only remaining question is whether Relators should be granted leave to amend once

again.  Although leave to amend a complaint should be freely given "when justice so requires,"

Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny

leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

Contending that "Second Circuit law on reverse false claims changed after the Complaint was

filed (*Miller*)," Relators seek leave to amend to add a count under Section 3729(a)(1)(D) of the

FCA, which applies to any person who "has possession, custody, or control of property or money

used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less

than all of that money or property."  31 U.S.C. § 3729(a)(1)(D); *see* Rels.' Opp'n 18.

The Court denies Relators' request.  For one thing, Relators do not explain how or why

the Second Circuit's decision in *Miller* — which construed only the FCA's reverse false claims

provision — suggests that they should be permitted to bring a new claim under an entirely

different provision.  That is especially so where, as here, the Court previously granted Relators

leave to amend the Complaint to cure the deficiencies raised in Defendants' first motions to

dismiss and expressly warned that they would "not be given any further opportunity" to do so. *See* ECF No. 43; *see also, e.g.*, *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (providing that a plaintiff's "failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend *sua sponte*" (citing cases)). In any event, it is well established that a district court may deny leave to amend where amendment would be futile. *See, e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). And that is the case here, as any claim under Section 3729(a)(1)(D) would fail for the same reason as Relators' claims under Sections 3729(a)(1)(A) and 3729(a)(1)(B) — namely, the lack of "property or money" within the meaning of the FCA.

Accordingly, the Clerk of Court is directed to terminate ECF Nos. 51, 55, and 59; to enter judgment in Defendants' favor consistent with this Opinion and Order; and to close the case.

SO ORDERED.

Dated: January 3, 2025
       New York, New York

_____
JESSE M. FURMAN
United States District Judge